IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

SEP 3 0 2004

CITIZENS FOR ALTERNATIVES
TO RADIOACTIVE DUMPING, et al.,

      Plaintiffs,

CLERK

vs.                          No.   **CIV 99-321 MCA/ACT**

CAST TRANSPORTATION, INC., and
WESTINGHOUSE ELECTRIC COMPANY,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the parties' responses [Doc. No. 300, 301, 309] to the *Order to Show Cause* [Doc. No. 296] filed on July 1, 2004, and the following motions: Defendant Westinghouse Electric Company's *Motion for a Ruling on Plaintiff's Motion to Alter the Court's Prior Judgment Dismissing Westinghouse or in the Alternative for an Order Dismissing All Claims Against Westinghouse and CAST* [Doc. No. 194] filed on June 2, 2003; *Plaintiffs' Objections to Magistrate's Order of August 20, 2003 Adopting Provisional Discovery Plan* [Doc. No. 223] filed on September 4, 2003; Plaintiffs' *Motion for Joinder of Tri-State Motor Transit Company, Party Needed for Just Adjudication Pursuant to Rule 19, and Motion for Issuance of Summons* [Doc. No. 228] filed on October 22, 2003; *Defendant CAST Transportation, Inc.'s Motion for Summary Judgment* [Doc. No. 262] filed on April 5, 2004; Defendants Westinghouse and CAST

312

Transportation's **Motion to Strike Jury Demand** [Doc. No. 265] filed on April 5, 2004; and Defendant Westinghouse's **Motion for Summary Judgment** [Doc. No. 267] filed on April 5, 2004. Having considered the parties' submissions, the relevant law, and being fully advised in the premises, the Court grants Defendants' motions for summary judgment [Doc. No. 262, 267], grants Defendants' motion to strike Plaintiffs' jury demand [Doc. No. 265], denies Defendants' motion to dismiss [194], and denies Plaintiffs' motions [Doc. No. 223, 228]. This action is to be dismissed with prejudice for the reasons set forth below.

## I.   BACKGROUND

The action presently before this Court originated in the First Judicial District Court of the State of New Mexico as a public-nuisance claim under state law seeking to enjoin the operation of the Waste Isolation Pilot Plant (WIPP), a disposal system for transuranic radioactive waste[1] (TRU waste) centered around an underground facility located near Carlsbad in southeastern New Mexico. As used in this *Memorandum Opinion and Order*, the term "WIPP" refers to the disposal system as a whole, including both the underground facility itself *and* the vehicles used to transport the waste to that facility.

On March 24, 1999, Defendants United States Secretary of Energy and United States Department of Energy (hereinafter "Federal Defendants") removed this action to the United States District Court for the District of New Mexico pursuant to 28 U.S.C. § 1442(a)(1).

---

[1]"Transuranic waste" is defined as: "Waste materials (excluding high-level waste and certain other waste types) contaminated with alpha-emitting radionuclides that are heavier than uranium with half-lives greater than 20 years and occur in concentrations greater than 100 nanocuries per gram. Transuranic waste results primarily from plutonium reprocessing and fabrication as well as research activities at U.S. Department of Energy defense installations." [SEIS-II, at GL-17.]

[Doc. No. 1.] The same day, Plaintiff's request for a temporary restraining order was denied after a hearing, and the Defendants began the process of transporting the first shipment of transuranic waste to the WIPP facility. [Doc. No. 3.]

Plaintiffs were granted leave to amend their complaint on several occasions during the first two years of this litigation. [Doc. No. 16, 66, 108, 165, 175.] During this period, Plaintiffs' public-nuisance claim against the Federal Defendants was dismissed, and certain allegations pertaining to Plaintiffs' public-nuisance claim against Defendants Westinghouse Electric Company and CAST Transportation, Inc. (collectively the "Private Defendants") were stricken from Plaintiffs' pleadings. [Doc. No. 66, 68, 108, 165.] On August 31, 2001, Plaintiffs filed their *Final Complaint* [Doc. No. 168] consisting of a claim under the National Environmental Policy Act (NEPA) against the Federal Defendants and a public-nuisance claim under state law against the Private Defendants.

Plaintiffs' NEPA claim against the Federal Defendants was dismissed in the *Memorandum Opinion and Order* [Doc. No. 295] filed on June 30, 2004. In that *Memorandum Opinion and Order*, this Court denied the relief requested in Plaintiffs' *Motion and Brief in Support of Judgement for Plaintiffs on NEPA Claims in the Second Amended Complaint* [Doc. No. 125, as amended by Doc. No. 172], and granted the relief requested in the *Federal Defendants' Motion to Dismiss Due to Plaintiffs' Failure to Demonstrate the Requirements for Injunctive Relief* [Doc. No. 196]. The result of these rulings is that the only remaining claim asserted in Plaintiffs' *Final Complaint* is a public-nuisance claim under

3

state law against the Private Defendants.[2]

The remaining parties have filed several additional motions relating to Plaintiffs' public-nuisance claim. [Doc. No. 194, 223, 228, 262, 265, 267.] Before proceeding to rule on these pending motions, I issued an *Order to Show Cause* [Doc. No. 296] on July 1, 2004, requiring the parties to brief the issue of whether this Court can properly exercise jurisdiction over Plaintiffs' remaining public-nuisance claim against the Private Defendants in light of the dismissal of the NEPA claim against the Federal Defendants. In response to the *Order to Show Cause*, Defendants Westinghouse and CAST assert that this Court should continue to exercise jurisdiction over Plaintiffs' public-nuisance claim for purposes of deciding the dispositive motions that are pending, while Plaintiffs assert that the public-nuisance claim should be remanded to state court at this juncture.

The allegations in Plaintiffs' *Final Complaint* which pertain to their public-nuisance claim against the Private Defendants can be summarized as follows. First, Plaintiffs generally allege that the "WIPP site and the related transportation system are dangerous to the public health of Plaintiffs and the citizens of New Mexico because of the potential injurious release of hazardous materials in New Mexico" and that the "opening of the WIPP site and the transport of shipments thereto is a violation of and interference with the exercise and enjoyment of the public right of New Mexicans to be protected from transport and

---

[2]The Court recognizes that Defendant Westinghouse disputes whether it is still a proper party to this action in light of the Court's prior rulings [Doc. No. 68, 108, 165, 194], and that Plaintiff has moved to join Tri-State Motor Transit Company as a Defendant [Doc. No. 228].

4

storage of hazardous and radioactive wastes." [Doc. No. 168, at ¶¶ 38, 47.]

More specifically, Defendant Westinghouse is alleged to have created or maintained

a public nuisance by committing the following violations relating to the permit for the WIPP

facility issued by the New Mexico Environment Department (NMED) under the Resource

Conservation and Recovery Act (RCRA):

> a.   Westinghouse accepted mixed (hazardous and radioactive) waste (Waste Stream Profile INW 276) at the WIPP site before the site was permitted under [RCRA] to accept mixed waste. . . .

> b.   Westinghouse accepted waste for storage that was mis-characterized in violation of [RCRA].

> c.   storage of waste that was mixed hazardous and radioactive waste when the permit did not allow for such storage.

> d.   failure to conduct the number and breadth of inspections of waste required by the RCRA permit thus increasing the likelihood of mixing wastes in a hazardous manner and causing the likelihood of the release of hazardous wastes.

> e.   Knowingly using storage drums that are not the ones which were tested and allegedly proven safe in the event of roof falls in the storage panels at WIPP. At recent public hearings experts have testified that there is a strong likelihood of a roof fall within one or two years. Thus Westinghouse is knowingly exposing workers and the public to unacceptably high potentials for puncture of the drums and contamination within and beyond the WIPP site in violation of OSHA, 29 U.S.C. § 641 et seq., the Clean Air Act, 42 U.S.C. § 7422 et seq., Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C.A. §§ 9601-9675, and the Atomic Energy Act, 42 U.S.C. §§ 2011-2282.

> f.   Operating WIPP while two gallons of water per minute have been flowing out of the underground formation known as the Dewey Lake Redbeds and through the main exhaust shaft at the site, preventing proper monitoring of the radioactivity of the site in violation of the Atomic Energy

Act.

     g.    Knowingly relying on false or obviously inadequate Particle Studies that omitted data for lightweight particles that could rise up the exhaust shaft at the WIPP site and contaminate the environment. This study was used to claim that particle emissions from the facility would not violate the Clean Air Act or the Atomic Energy Act.

[Doc. No. 168, at ¶ 39.] In its *Answer*, Defendant Westinghouse denies each of these allegations and asserts that Plaintiffs' pleading fails to state a claim upon which relief may be granted. [Doc. No. 181.]

The specific allegations pertaining to Defendant CAST are that:

    43.    The WIPP site and related transportation system are dangerous to the public safety of the Plaintiffs and citizens of New Mexico because of the dangers of transporting materials, particularly along the Santa Fe "bypass" and through the community of El Dorado, that have the potential for injurious release of hazardous materials in New Mexico.

    44.    Defendant CAST has knowingly transported waste with an unacceptable risk for the potential for methane gas fires.

    45.    Defendant CAST has knowingly transported waste when over half of the emergency service providers in New Mexico along the WIPP route are admittedly not adequately prepared for dealing with emergencies or accidents resulting from the transportation of hazardous materials to the WIPP site.

    46.    The continuation of the WIPP project by CAST Transportation Inc. is unlawful because it violates DOE contracts made for the benefit of the public and entered into with the Western Governors' Association, the State of New Mexico and the City of Santa Fe . . . .

[Doc. No. 168, at ¶¶ 43-46.] In its *Answer*, Defendant CAST denies these allegations and asserts that Plaintiffs' pleading fails to state a claim upon which relief may be granted. [Doc.

No. 181.]

As Plaintiffs' *Final Complaint* was not filed until after the initial discovery deadline set forth in the *Initial Pretrial Report* [Doc. No. 59], the Court granted Plaintiffs leave to reopen discovery at a status conference on April 30, 2003, and new case-management deadlines were set by United States Magistrate Judge Alan Torgerson. [Doc. No. 193, 211, 220, 221, 222, 225, 230.] After the parties were granted this additional opportunity to conduct discovery on the new allegations pertaining to the public-nuisance claim in Plaintiff's *Final Complaint*, Defendants Westinghouse and CAST each filed motions for summary judgment with respect to this claim. [Doc. No. 262, 267.] In addition, the Private Defendants each joined in a motion to dismiss all claims against them and a motion to strike Plaintiffs' jury demand. [Doc. No. 194, 265.]

Plaintiffs also have filed procedural motions relating to their public-nuisance claim. On September 4, 2003, Plaintiffs filed objections to the ninety-day stay of discovery set forth in the United States Magistrate Judge's *Order* adopting the parties' provisional discovery plan. [Doc. No. 223.] On October 22, 2003, Plaintiffs' filed their *Motion for Joinder of Tri-State Motor Transit Company, Party Needed for Just Adjudication Pursuant to Rule 19, and Motion for Issuance of Summons.* [Doc. No. 228.] Each of the above motions is discussed in further detail in the analysis below.

## II.    ANALYSIS

### A.    Jurisdiction

Before turning to the merits of Plaintiffs' public-nuisance claim, I must first determine whether this Court has jurisdiction to rule on the various procedural and dispositive motions that remain pending after the dismissal of Plaintiffs' NEPA claim against the Federal Defendants.  The allegations of public nuisance stated on the face of Plaintiffs' *Final Complaint* arise under state law.  Therefore, it is unlikely that Plaintiffs' pleading presents a "federal question" for purposes of establishing original jurisdiction in this Court under 28 U.S.C. § 1331.

In response to the Court's *Order to Show Cause*, however, Defendants Westinghouse and CAST contend that this Court has jurisdiction over Plaintiffs' public-nuisance claim under the supplemental jurisdiction statute, 28 U.S.C. § 1367, the diversity jurisdiction statute, 28 U.S.C. § 1332, and the removal statute for persons acting under a federal officer, 28 U.S.C. § 1442(a)(1).  The Plaintiffs' response to the Court's *Order to Show Cause* denies these contentions and asserts that the remaining public-nuisance claim against the Private Defendants should be remanded to the First Judicial District Court for the County of Santa Fe, New Mexico.

The Court first addresses the issue of supplemental jurisdiction.  Ordinarily, "district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original

8

jurisdiction." 28 U.S.C. § 1367(c)(3); see United Mine Workers of Am. v. Gibbs, 383 U.S.

715, 726 (1966). The mere fact that this Court has dismissed the Federal Defendants who

initially removed this action under 28 U.S.C. § 1442(a)(1), however, does not automatically

require this Court to remand the remaining claim to state court. See Parker v. Della Rocco,

197 F.R.D. 214, 216-17 (D. Conn. 2000) (collecting cases), aff'd 252 F.3d 663, 665-66 (2d

Cir. 2001).

It is appropriate for a court to decline to exercise supplemental jurisdiction when the

only remaining claim may involve "a novel or complex issue of State law." 28 U.S.C. §

1367(c)(1). Notions of comity and federalism demand that a state court try such state-law

claims in the first instance, absent compelling reasons to the contrary. See Thatcher Enters.

v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990). For these reasons, this Court

is reluctant to retain jurisdiction over Plaintiffs' public-nuisance claim based solely on the

supplemental jurisdiction conferred by 28 U.S.C. § 1367.

Before declining to exercise jurisdiction over this claim, however, the Court must

consider whether judicial economy, convenience, fairness, and notions of comity and

federalism would be served by retaining jurisdiction. See City of Chicago v. Int'l Coll. of

Surgeons, 522 U.S. 156, 172-73 (1997); Anglemyer v. Hamilton County Hosp., 58 F.3d 533,

541 (10th Cir. 1995). Moreover, the law may require this Court to retain this action on its

docket if there is a valid, alternative basis for establishing original jurisdiction in this forum,

such as diversity jurisdiction under 28 U.S.C. § 1332 or removal by a person acting under

a federal officer pursuant to 28 U.S.C. § 1442(a)(1).

After considering all of these factors, I conclude that there are compelling reasons for this Court to retain jurisdiction over Plaintiffs' public-nuisance claim against the Private Defendants for the purpose of ruling on the motions which are currently pending. In particular, I find that the nature and extent of pretrial proceedings, judicial economy, convenience, fairness, and notions of comity and federalism all weigh in favor of retaining jurisdiction under the specific circumstances of this case. I also find that but for the unusual procedural posture in which this case was removed to this Court by the Federal Defendants, Defendants Westinghouse and CAST would have been able to independently remove this action based on diversity jurisdiction under 28 U.S.C. § 1332 or on the grounds that they are persons acting under a federal officer under 28 U.S.C. § 1442(a)(1).

Plaintiffs object to the Private Defendants' assertion of diversity jurisdiction on the grounds that it is untimely and that the Private Defendants have not proven that a permanent injunction could cause the amount in controversy to exceed $75,000. These objections are without merit. The documents in the record show that the Private Defendants have contracts worth millions of dollars that are likely to last several years into the future if WIPP remains in operation. If the Court were to permanently enjoin the operation of WIPP on the grounds that it is a public nuisance, it is reasonable to conclude that these contracts would be lost, disrupted, or diminished to an extent that would result in costs to each of these Defendants that exceeds $75,000. In the alternative, the cost of rerouting or storing the waste in question

10

at other locations in order to comply with an injunction would likely increase each of the Private Defendants' costs by more than $75,000. Therefore, the amount in controversy requirement is satisfied. See Justice v. Atchison, Topeka & Santa Fe Ry. Co., 927 F.2d 503, 505 (10th Cir. 1991) (measuring amount in controversy by the defendant's cost of complying with an injunction).

As for the timeliness of the Private Defendants' assertion of diversity jurisdiction, Plaintiffs correctly point out that 28 U.S.C. § 1446(b) generally places a one-year time limit on removal of cases based on diversity jurisdiction. The legislative history suggests that Congress intended this provision to preclude removal "late in the proceedings" after "substantial progress has been made in state court." H.R. Rep. No. 889, 100th Cong., 2d Sess., at 71-73 (1988), reprinted in 1988 U.S.C.C.A.N. 5982, 6031-34.

In this case, however, no progress was made in state court because the Federal Defendants removed the action pursuant to 28 U.S.C. § 1442(a)(1) on the same day that Plaintiffs filed their initial pleading in state court. [Doc. No. 1.] Removal by a federal officer or agency pursuant to 28 U.S.C. § 1442(a)(1) does not require the consent of other defendants or a showing that a federal court would have original jurisdiction over the entire action. See Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034-35 (10th Cir. 1998). Therefore, there was no need for Defendants Westinghouse or CAST to concur in the removal or provide additional grounds for removal on the record at that time.

Further, there is no record that the Defendants were formally served with a *Summons*

before this Court denied Plaintiffs' request for a temporary restraining order and dismissed Plaintiffs' initial pleading. [Doc. No. 2, 3.] Thus, the 30-day time period for filing notices of removal pursuant to 28 U.S.C. § 1446(b) never came into play before this initial pleading was dismissed on March 29, 1999. See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 347-49 (1999).

After the case was dismissed, Plaintiffs voluntarily invoked the jurisdiction of this Court by filing a motion to alter or amend the judgment and allow the filing of an amended complaint adding a federal claim under NEPA. [Doc. No. 4.] Under these circumstances, Defendants Westinghouse and CAST cannot reasonably be expected to have indicated their consent to removal or independently filed their own notices of removal within 30 days of service of Plaintiff's initial pleading (or the first pleading naming CAST and Westinghouse as Defendants). Before that time period expired, the case had already been removed by the Federal Defendants, and Plaintiffs had voluntarily invoked this Court's jurisdiction.

To the extent that Plaintiffs now wish to assert, for the first time, a defect in the removal procedure with respect to Defendants Westinghouse and CAST, Plaintiffs' objections are deemed waived. See Akin, 156 F.3d at 1036; cf. Huffman v. Saul Holdings Ltd. P'ship, 194 F.3d 1072, 1076-77 (10th Cir. 1999) (noting that while a defect in subject-matter jurisdiction can never be waived, a defect in removal procedure "does not involve the subject matter jurisdiction of the court and may be waived"). Moreover, even if the removal statutes must be strictly construed so as to preclude the Private Defendants from raising

diversity jurisdiction at this stage of the litigation, the fairness of that preclusion and the extent to which Plaintiffs have engaged in forum manipulation by first invoking and then disavowing federal jurisdiction, are still factors this Court may consider in determining whether to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 351, 356-57 & n.12 (1988); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 738 (3d Cir. 1994); cf. Tedford v. Warner-Lambert Co., 327 F.3d 423, 425-26 (5th Cir. 2003) (recognizing equitable tolling of one-year time limit for removal where the plaintiff has engaged in forum manipulation).  These factors weigh in favor of retaining supplemental jurisdiction over Plaintiffs' public-nuisance claim at this juncture.

Defendants Westinghouse and CAST also assert that this Court's exercise of jurisdiction is proper at this time because they are persons acting under a federal officer within the meaning of 28 U.S.C. § 1442(a)(1).  Federal-officer jurisdiction under this statute provided the basis for the Federal Defendants' removal of this action on March 24, 1999. [Doc. No. 1.]  Plaintiffs never objected or moved to remand this case on the grounds that such jurisdiction was lacking with respect to the Federal Defendants.  In response to the Court's Order to Show Cause, however, Plaintiffs now claim for the first time that the Private Defendants may not establish jurisdiction in this Court by asserting that they are persons acting under a federal officer.

To establish grounds for removal to federal court under 28 U.S.C. § 1442(a)(1), a

person must: "(1) establish that he or she was acting under the direction of a federal officer, (2) raise a colorable federal defense to the plaintiff's claims, and (3) show a causal nexus between the plaintiff's claims and the acts performed under color of office." 16 James Wm. Moore, Moore's Federal Practice § 107.15[1][b], at 107-120.2 (3d ed. 2004); accord Greene v. Citigroup, Inc., 215 F.3d 1336, 2000 WL 647190, at *2 (10th Cir. 2000) (unpublished disposition). Defendants CAST and Westinghouse meet each of these requirements.

With regard to the first requirement, the evidence of record in this case reasonably supports the conclusion that Defendants Westinghouse and CAST were acting under the direction of federal officers when they engaged in some, if not all, of the activities that Plaintiffs allege to be the source of a public nuisance. Under the relevant contracts and regulatory schemes, federal officers have direct and detailed control over the activities of these Defendants. See Reed v. Fina Oil, 995 F. Supp. 705, 710-11 (E.D. Tex. 1998); Fung v. Abex Corp., 816 F. Supp. 569, 572-73 (N.D. Cal. 1992); Pack v. AC & S, Inc., 838 F. Supp. 1099, 1103 (D. Md. 1993).

Further, the injunctive relief requested in Plaintiffs' *Final Complaint* is not simply to enjoin Defendant CAST from violating speed limits on state highways or to enjoin Defendant Westinghouse from violating the RCRA permit administered by the NMED. Rather, Plaintiffs ask the Court to "[g]rant a permanent injunction enjoining Defendants from placing any waste at WIPP because WIPP and the related waste transport are public nuisances." [Doc. No. 168, at 13.] Such broad injunctive relief is not limited to the specific

traffic and permit violations alleged in Plaintiffs' pleading; it would also encompass future actions directed by federal officers. Under 28 U.S.C. § 1442(a)(1), it is appropriate to remove suits for injunctive relief that would effectively prohibit federal officers from directing future official acts. See Florida v. Cohen, 887 F.2d 1451, 1453 (11th Cir. 1989).

The Court next evaluates whether the Private Defendants have asserted a colorable federal defense. This requirement follows from the Supreme Court's interpretation of the removal statute for federal officers as an exception to "the 'well-pleaded complaint' rule which would otherwise preclude removal even if a federal defense were alleged." Mesa v. California, 489 U.S. 121, 136 (1989). Under this interpretation, removal pursuant to 28 U.S.C. § 1442(a)(1) allows defendants who are federal officers or persons acting under them to establish jurisdiction in a federal court under Article III of the United States Constitution by presenting a federal question in their defense rather than relying on the presence of a federal question on the face of the plaintiff's pleading. See id.

But a defendant's mere status as a federal officer or a person acting under a federal officer does not present the type of federal question necessary to satisfy the jurisdictional requirements of Article III. For example, 28 U.S.C. § 1442(a)(1) does not permit federal officers to remove a criminal prosecution for traffic violations from state court based solely on the fact that they were acting within the scope of their federal employment at the time the traffic violations allegedly occurred, see Mesa, 489 U.S. at 135, nor may government contractors remove a civil action for damages from state court based solely on the fact that

15

they have contracts with the United States Government and were carrying out activities pursuant to those contracts at the time of the conduct which gave rise to the plaintiffs' claims, see Freiberg v. Swinerton & Walberg Property Servs., Inc., 245 F. Supp. 2d 1144, 1156 (D. Colo. 2002).

The posture of the present case is unique in that Plaintiffs have brought a civil action seeking broad injunctive relief based on a theory of public nuisance. In this context, the New Mexico Supreme Court has held that "due authorization is a valid defense to the allegation that a municipal public works project is a nuisance in fact." State of N.M. ex. rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque, 119 N.M. 150, 165, 889 P.2d 185, 200 (1994) (hereinafter "City of Albuquerque II"); accord City of Albuquerque v. State ex rel. Village of Los Ranchos de Albuquerque, 111 N.M. 608, 612, 808 P.2d 58, 62 (Ct. App. 1991) (hereinafter City of Albuquerque I"). A "duly authorized" public works project is defined as "one that conforms with *all* the federal, state, and local laws, rules, and regulations pertinent to that particular project." City of Albuquerque II, 119 N.M. at 158, 889 P.2d at 193. Thus, conformity with federal laws is a component of a colorable defense to a public-nuisance claim brought against a public works project, particularly where the claim seeks to enjoin the project as a whole rather than just discrete portions which fall outside federal control.

I note that Plaintiffs' *Final Complaint* alleges that "Defendants are not in compliance with all lawful authority" with respect to the opening of the WIPP site and the transport of

shipments thereto,[3] [Doc. No. 168, at ¶ 48] and that Defendants Westinghouse and CAST deny this allegation in their *Answer* [Doc. No. 181] and have filed dispositive motions asserting that their actions are duly authorized and in compliance with all lawful authority (including federal law).    [Doc. No. 194, 262, 267.]    I conclude that Defendants Westinghouse and CAST have asserted a colorable federal defense to Plaintiffs' public nuisance claim.

Plaintiffs attempt to avoid this conclusion by pointing out that their *Final Complaint* also alleges violations of state law, *e.g.*, violations of speed limits on state highways by Defendant CAST's trucks and violation of the RCRA permit administered by the NMED. As indicated in the Court's *Memorandum Opinion and Order* [Doc. No. 68] filed on March 9, 2000, these allegations in Plaintiffs' pleading may be sufficient to overcome the "due authorization" defense for purposes of defeating a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

In order to remove an action under 28 U.S.C. § 1442(a)(1), however, the Private Defendants need not assert a federal defense that is so unquestionably meritorious as to require dismissal of Plaintiffs' public-nuisance claim in its entirety under Fed. R. Civ. P. 12(b)(6).   Rather, the Private Defendants need only establish a federal defense that is "colorable" with respect to one of Plaintiffs' claims.  See Jefferson County v. Acker, 527

---

[3]The very first *Order* entered by the Court in this matter on March 29, 1999, cites the City of Albuquerque cases and states that: "Plaintiffs agree that the activity may only be considered a public nuisance if it is unlawful." [Doc. No. 2.]

U.S. 423, 431 (1999). They have done so here.[4]

Turning to the third requirement, Defendants Westinghouse and CAST have shown a causal nexus between the Plaintiffs' public-nuisance claim and the acts these Defendants perform under color of office. In this regard, the Court again notes that the public-nuisance claim asserted in Plaintiffs' *Final Complaint* is not limited to specific traffic offenses or permit violations that fall outside the direction of federal officers; the *Final Complaint* also contains more general allegations that the "WIPP site and related transportation system are dangerous to the public health of Plaintiffs and the citizens of New Mexico because of the potential injurious release of hazardous materials in New Mexico" and that the "opening of the WIPP site and the transport of shipments thereto is a violation of and interference with the exercise and enjoyment of the public right of New Mexicans to be protected from transport and storage of hazardous and radioactive wastes." [Doc. No. 168.] Based on these allegations, Plaintiffs seek to enjoin the Private Defendants "from placing any waste at WIPP." In this respect, Plaintiffs' public-nuisance claim is not limited to violations of state law which fall outside the direction of federal officers (*e.g.*, violations of speed limits). Rather, Plaintiffs' public-nuisance claim also encompasses acts which are performed at the

---

[4]The Court notes that at the initial hearing on Plaintiffs' request for a temporary restraining order, the Defendants pointed out that the shipment in question at that time contained waste that was radioactive but not otherwise hazardous; therefore, the State of New Mexico had no regulatory authority over the shipment and its legality was determined solely by reference to federal law. [Doc. No. 2, 3.] Defendants raise similar concerns with respect to some of the violations alleged in Plaintiffs' *Final Complaint* and also challenge Plaintiffs' assertions that there are any actual adjudicated violations of state law. Thus, federal law still may be determinative for purposes of establishing a "colorable" federal defense under 28 U.S.C. § 1442(a)(1).

direction of federal officers, and there is a causal nexus between this claim and those acts. See Cohen, 887 F.2d at 1453.

One of the purposes of the removal statute for federal officers is "to prevent state courts from interfering with the implementation of federal law." Freiberg, 245 F. Supp. 2d at 1150. "In enacting the statute, Congress recognized 'that federal officers are entitled to, and the interest of national supremacy requires, the protection of a federal forum in those actions commenced in state court that could arrest, restrict, impair, or interfere with the exercise of federal authority by federal officials.'" Cohen, 887 F.2d at 143 (quoting Murray v. Murray, 621 F.2d 103, 106 (5th Cir. 1980)).

This case presents such a scenario because WIPP is not simply a waste-disposal system with operations limited to New Mexico. Rather, WIPP is designed to remedy a national problem concerning the disposition of defense-related transuranic waste that has accumulated at various facilities throughout the country over the course of the past fifty years or more. Thus, to grant an injunction prohibiting Defendants Westinghouse and CAST from bringing or placing such waste at the WIPP facility would, in effect, require such waste to remain at other facilities, including those in other states, and tie the hands of federal officers and agencies charged with ensuring the proper disposition of such waste.[5]

Even if Defendants Westinghouse and CAST are precluded from asserting federal-

---

[5]The Court notes that other civil actions, including nuisance claims, have been filed with respect to some of the facilities in other states from which WIPP accepts hazardous or radioactive waste. See, e.g., Cook v. Rockwell Int'l Corp., 273 F. Supp. 2d 1175, 1201-03 (D. Colo. 2003).

officer jurisdiction under 28 U.S.C. § 1442(a)(1) at this juncture on procedural grounds, the Court may consider the federal interests implicated by this action, and its potential effect on the actions of federal officers, in deciding whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367. In this regard, I find that the broad injunctive relief requested by Plaintiffs in this case would significantly impact federal interests in carrying out a national, congressionally mandated program for the safe disposition of defense-related transuranic waste. These federal interests are sufficient to outweigh the notions of comity and federalism that would ordinarily require causes of action based on state law to be tried in a state court. See Gibbs, 383 U.S. at 726 ("There may . . . be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong.").

Finally, I consider the nature and extent of pretrial proceedings and whether judicial economy and convenience would be served by retaining jurisdiction over Plaintiffs' public nuisance claim. The record reflects that this litigation commenced more than five years ago on March 24, 1999, and was removed to this Court on that same date before any rulings had been made by the state court. Over 300 entries have been made on the docket since the case was removed to this Court, and due to the peculiar procedural posture of this case, it was necessary for this Court to issue several prior rulings pertaining to Plaintiffs' public-nuisance claim in order to resolve issues such as whether Plaintiffs were entitled to a temporary restraining order [Doc. No. 2], whether to permit amendments to the pleadings [Doc. No. 16,

66, 68, 105, 165], and which allegations in those pleadings provided a legitimate basis for conducting discovery [Doc. No. 193]. Further, several of the factual allegations pertaining to Plaintiffs' remaining public-nuisance claim were previously reviewed by this Court in the context of adjudicating Plaintiffs' NEPA claim (*e.g.*, the issue of roof fall, the alleged water leak in exhaust shaft, and various transportation and workplace safety issues). The two claims involve a common nucleus of facts, and this Court already has expended significant judicial resources with respect to both claims. Under these circumstances, I conclude that *this case presents one of the rare and unusual instances in which considerations of judicial economy weigh strongly in favor of exercising supplemental jurisdiction* under 28 U.S.C. § 1367. See, e.g., Miller Aviation v. Milwaukee County Bd. of Supervisors, 273 F.3d 722, 732 (7th Cir. 2001) (concluding that exercise of supplemental jurisdiction was appropriate where the district court spent more than five years overseeing multifaceted litigation, considered 22 motions, held 9 hearings, and issued 19 orders, including a 71- page decision demonstrating mastery of minute details of the case); Newport Ltd. v. Sears, Roebuck & Co., 941 F.2d 302, 307-08 (5th Cir. 1992) (concluding that exercise of supplemental jurisdiction was appropriate "after four years of litigation produced 23 volumes and thousands of pages of record, the  preparation of a pretrial order exceeding 200 pages, over a hundred depositions, and according to counsel nearly two hundred thousand pages of discovery production"). For all of the above reasons, I conclude that the Private Defendants have shown good cause for this Court to exercise jurisdiction over Plaintiffs' remaining public-

nuisance claim at this juncture for the purpose of ruling on the pending motions discussed below. The Court's *Order to Show Cause* [Doc. No. 296] is, therefore, quashed.

## B.    Objections to Discovery

The Court next addresses the parties' objections to the discovery and case-management deadlines imposed in this case after the filing of Plaintiffs' *Final Complaint*. In order to place these objections in context, it is necessary to recite, in further detail, some aspects of the history of this litigation.

An *Initial Pretrial Report* [Doc. No. 59] was filed on November 4, 1999, setting a discovery deadline of June 1, 2000. At Plaintiffs' request, the case-management deadlines established in the *Initial Pretrial Report* were extended numerous times. [Doc. No. 69, 79, 82, 86, 99, 103, 121, 122, 129, 134, 154, 156.] On August 8, 2002, after a period of more than four months had passed with no activity, Plaintiffs filed a motion to reopen discovery with respect to the new allegations in their *Final Complaint*. [Doc. No. 185.] At a status hearing on April 30, 2003, the Court granted Plaintiffs' motion in part and referred the matter to a United States Magistrate Judge to set new case-management deadlines. [Doc. No. 193.]

On June 2, 2003, Defendant Westinghouse filed a motion [Doc. No. 194] which, among other things, objected to the reopening of discovery on the grounds that Plaintiffs' only claim against Westinghouse had been dismissed by a prior *Order* [Doc. No. 68] and that Plaintiffs were attempting to litigate new claims against Westinghouse in their *Final*

22

*Complaint* [Doc. No. 168] without proper authorization from the Court. Thereafter, United

States Magistrate Judge Alan Torgerson held a scheduling conference and issued orders

[Doc. No. 211, 220, 221, 222, 224] imposing new case-management deadlines.   On

September 5, 2003, Plaintiffs filed objections to one of Judge Torgerson's scheduling orders,

claiming that Judge Torgerson erred in imposing a 90-day stay of discovery and limiting the

number of interrogatories, requests for production, and requests for admission to 25 for each

party (instead of the 30 requested by Plaintiffs).   [Doc. No. 223.]

I determine that both parties' objections to the manner in which discovery was

reopened are without merit.   The portions of the *Order* [Doc. No. 221] to which Plaintiffs

object involved Judge Torgerson's ruling on nondispositive pretrial scheduling matters and

was not clearly erroneous or contrary to law.   See Fed. R. Civ. P. 72(a); 28 U.S.C.

636(b)(1)(A) (1994).   A United States Magistrate Judge is afforded broad discretion in the

resolution of non-dispositive discovery matters, see Comeau v. Rupp, 810 F. Supp. 1127,

1167 (D. Kan. 1992), and in this case the portions of Judge Torgerson's ruling to which

Plaintiffs object do not contravene the directives given by this Court at the status conference

on April 30, 2003.   I find that the imposition of a 90-day stay of discovery was appropriate

to afford the Court additional time to review pending motions which could affect the parties'

discovery obligations and other related case-management issues.   Plaintiffs have failed to

show how they were unfairly prejudiced by this 90-day stay, and I note that much of the

delay in bringing this case to resolution can be attributed to the large number of extensions

23

that Plaintiffs have requested and obtained in this matter.

Defendant Westinghouse's objections to the procedure which resulted in the addition of new allegations against Westinghouse in Plaintiffs' *Final Complaint* are also without merit, albeit for different reasons. While the Court initially granted the motion to dismiss Plaintiffs' public-nuisance claim against Defendant Westinghouse [Doc. No. 68], it is clear from the Court's subsequent orders [Doc. No. 108, 165] that the Court altered its judgment as to this issue and permitted Plaintiffs to add new allegations against Defendant Westinghouse in their *Final Complaint*, subject to the *caveat* that: "If Plaintiffs' Final Complaint still does not comply with the Court's previous rulings, the Court will immediately entertain motions to strike portions of the Final Complaint by the Defendants." [Doc. No. 165, at 5.] The Court provided Defendants with "ten days from the date of entry of Plaintiffs' 'Final Complaint' to file motions to strike portions of the complaint which fail to comply with the Court's previous rulings." [Doc. No. 165, at 6.] The Court did not call for Plaintiffs to refile their previous motion under Fed. R. Civ. P. 60(b) unless and until "Defendants have submitted their motions to strike portions of the 'Final Complaint.'" [Doc. No. 165, at 6, 7.]

Defendant Westinghouse did not file a motion to strike Plaintiffs' *Final Complaint* within the time-period specified in the Court's *Memorandum Opinion and Order* [Doc. No.

24

165] filed on August 3, 2001.[6] Rather, Defendant Westinghouse waited until June 2, 2003,

to file a motion requesting a ruling on this issue. By that date, Defendants had already filed

their *Answer* [Doc. No. 181] to the *Final Complaint* [Doc. No. 168], and discovery was

about to commence on the new allegations. [Doc. No. 194.] Under these circumstances, I

conclude that Defendant Westinghouse waived the issue of whether the amendments

contained in the *Final Complaint* complied with the procedural requirements under Fed. R.

Civ. P. 60(b).

The Court will not fault Plaintiffs for failing to refile their motion under Fed. R. Civ.

P. 60(b) with respect to the allegations against Defendant Westinghouse where the Court's

prior ruling expressly provided that Plaintiffs could not do so until *after* Defendant

Westinghouse timely filed a motion to strike those allegations, and Defendant Westinghouse

never filed such a motion within the deadline imposed by the Court. To the extent that a

motion under Fed. R. Civ. P. 60(b) is still pending as to Defendant Westinghouse, the Court

grants that motion for the limited purpose of allowing the allegations in Paragraph 39

through 39(g) to be included in Plaintiffs' *Final Complaint*. Defendant Westinghouse's

objections to the evidentiary foundation for these allegations is better addressed in the

context of their motion for summary judgment, which is discussed below.

---

[6]The Court notes that the Federal Defendants were the only Defendants to file a motion to strike [Doc. No. 169], and that motion was denied. [Doc. No. 175.] Thus, there was no reason for Plaintiffs to refile their motion under Fed. R. Civ. P. 60(b) in response to the Federal Defendants' motion to strike.

**C.**   **Motion for Joinder of Tri-State and Requests to Amend Complaint**

I next address Plaintiffs' belated attempts to add new parties or new claims to this litigation after the filing of the *Final Complaint*. On October 22, 2003, Plaintiffs filed a motion to join Tri-State Motor Transit Company (Tri-State) under Fed. R. Civ P. 19. In their briefs filed in response to motions for summary judgment filed by the Defendants, Plaintiffs make additional requests to amend the *Final Complaint*. [See, e.g., Doc. No.284, at 6; Doc No. 275, at 4-5, 7.]

The Tenth Circuit has declined to treat such requests as valid motions to amend a complaint when they are raised for the first time in a plaintiff's response brief regarding a summary-judgment motion. See Green Country Food Market, Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279-81 (10th Cir. 2004); Evans v. McDonald's Corp., 936 F.2d 1087, 1091 (10th Cir. 1991). "The liberalized pleading rules . . . do not permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case." Green Country Food Market, Inc., 371 F.3d at 1279; accord Evans, 936 F.2d at 1091; see also Calderon v. Kan. Dept. of Soc. and Rehab. Servs., 181 F.3d 1180, 1186 (10th Cir. 1999) (stating that "normally a court need not grant leave to amend when a party fails to file a formal motion"); Glenn v. First Nat'l Bank, 868 F.2d 368, 370-71 (10th Cir. 1989) (similar).

More generally, it is within the Court's discretion to deny leave to amend a pleading under Fed. R. Civ. P. 15 based upon a justifying reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

26

amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962); accord Hom v. Squire, 81 F.3d 969, 973 (10th Cir. 1996). As the Court previously noted in the *Memorandum Opinion and Order* [Doc. No. 165] filed on August 3, 2001, untimeliness alone may be a sufficient reason to deny leave to amend a complaint, especially where there is no adequate explanation for the delay or the plaintiff should have known of the facts on which the amendment is based prior to the date of the existing pleading. See Franks v. U.S. West, Inc., 3 F.3d 1357, 1365-66 (10th Cir. 1993).

In this case, Plaintiffs were afforded numerous opportunities to amend their pleadings over the course of more than two years. After this period, this Court filed its *Memorandum Opinion and Order* of August 3, 2001, stating that "the Court will allow Plaintiffs one last opportunity to amend their complaint" and directing that "Plaintiffs shall re-file the Third Amended Complaint and entitle it 'Final Complaint.'" [Doc. No. 165. at 4, 5.] It is clear from this ruling that no further amendments would be permitted.

One of the problems generated by Plaintiffs' numerous and extended efforts to amend their pleadings was that the original deadline for completing discovery (which was extended several times at Plaintiffs' request) had already expired by the time the *Final Complaint* was filed. Thus, it was necessary for the Court to reopen discovery as to the new allegations in the *Final Complaint*. [Doc. No. 193.]

Plaintiffs now assert that because discovery was reopened as to the new allegations

in the *Final Complaint*, the additional case-management deadlines established for this limited purpose should also be construed as permitting additional amendments to the *Final Complaint*. This assertion is without merit. If Plaintiffs' theory were to be adopted, "the pleading phase of a lawsuit would never end." Glenn, 868 F.2d at 371. Plaintiffs could prolong the litigation indefinitely by engaging in a continuous cycle of amending their pleadings based on the reopening of discovery and then reopening discovery based on the amendment of their pleadings. The rules do not permit such a procedure to continue indefinitely.

The time has come for this litigation to move beyond the pleading phase. Plaintiffs' requests to amend the *Final Complaint* are untimely and must be denied.

Insofar as Plaintiffs' motion to join Tri-State as a party defendant also entails amendment of the *Final Complaint* under Fed. R. Civ. P. 15, this motion is untimely as well. Plaintiffs did not move to join Tri-State until October 22, 2003. [Doc. No. 228.] In support of their motion, Plaintiffs cite a publicly available web site as evidence that Tri-State "was awarded a contract to transport waste to the WIPP site on August 21, 2000." [Doc. No. 228, at ¶¶ 2, 3, citing "www.enmrd.state.nm.us/wipp/whatsnot.htm (August 21, 2000)."] Thus, Plaintiffs should have known of this information well before the time the *Final Complaint* was filed on August 31, 2001, [Doc. No. 168] and they have not provided an adequate explanation as to why it was necessary to wait until October 2003 to seek leave to amend. See Franks, 3 F.3d at 1365-66; cf. City of Albuquerque II, 119 N.M. at 160, 889 P.2d at 195

28

(declining to permit new allegations that could have been raised prior to Court of Appeals' ruling and noting the need to avoid "the unreasonable piecemeal adjudication that has heretofore characterized this litigation").

Neither Plaintiffs' *Final Complaint* filed on August 31, 2001, nor any of the prior versions of Plaintiffs' pleading contains a statement pursuant to Fed. R. Civ. P. 19(c) identifying Tri-State as a person not joined and explaining the reasons for not joining Tri-State at that time. Further, there have been no motions filed by any of the Defendants seeking to join Tri-State as a necessary party under Fed. R. Civ. P. 19(a), and Plaintiffs' motion under this rule admits that: "Counsel for the private and federal Defendants have been contacted regarding this Motion and all oppose it." [Doc. No. 228, at ¶ 11.]

Despite the untimeliness of Plaintiffs' motion, joinder of Tri-State may be necessary if Plaintiffs demonstrate that Tri-State is truly a "party needed for just adjudication" of this action under Fed. R. Civ. P. 19. A person is "necessary" or "needed for just adjudication" under this rule in three types of situations: (1) when "complete relief cannot be accorded among those already parties" without joinder of that person; (2) when the person "claims an interest relating to the subject of the action" and is so situated that the disposition of the action without joining the absentee "may as a practical matter impair or impede the person's ability to protect that interest"; or (3) when the person "claims an interest relating to the subject of the action" and is so situated that the disposition of the action without joining that person "may leave any of the persons already parties subject to a substantial risk of incurring

29

double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Fed. R. Civ. P. 19(a); 4 James Wm. Moore, Moore's Federal Practice § 19.02[3][a], at 19-18 (3d ed. 2004).

In this case, Plaintiffs appear to argue that they could not obtain "complete relief" without the joinder of Tri-State because if the Court were to enjoin CAST but not Tri-State, then Tri-State could simply take over the task of transporting the waste which CAST is prohibited from transporting. This argument does not provide a basis for joinder under Fed. R. Civ. P. 19(a)(1) because the term "complete relief" in that rule refers only to relief between the persons already parties, and not as between a party and the absent person whose joinder is sought. See Angst v. Royal Maccabees Life Ins. Co., 77 F.3d 701, 705 (3d Cir. 1996). The possibility that an absent person might cause future litigation or frustrate the outcome of the litigation between existing parties does not make that person a necessary party. See id.; 4 James Wm. Moore, supra, § 19.03[2][b][ii], at 19-39 to 19-41. "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." Temple v. Synthes Corp., 498 U.S. 5, 7 (1990) (per curiam) (citations omitted). Further, Plaintiffs have not shown that Tri-State's absence as a party-defendant would preclude this Court from effectively enjoining Defendants CAST or Westinghouse. See Fitzpatrick v. Bd. of Educ., City of Enid Pub. Schs., 578 F.2d 858, 860 (10th Cir. 1978).

Plaintiffs also appear to argue that the failure to join Tri-State may adversely affect Tri-State or subject the existing parties to a risk of inconsistent obligations in the event that

the Court were to find that a public nuisance *per se* resulted from some activity common to both Tri-State and CAST (such as using containers subject to methane-gas explosions or transporting waste without providing additional training to first responders). This Court has already ruled, however, that "the conduct of the Private Defendants carried out in accordance with valid federal authority cannot as a matter of law constitute a nuisance *per se*." [Doc. No. 68, at 4.] Rather, the viability of Plaintiffs' public-nuisance claim as to each of the Private Defendants depends on the facts particular to that Defendant, *i.e.*, whether that Defendant has created a nuisance *in fact* while engaging in specific activity outside the scope of its lawful authority (such as violating the RCRA permit or exceeding speed limits). Due to the fact-specific nature of Plaintiffs' claims against each Defendant, the impact of this litigation on Tri-State's interests (as well as the impact on the existing parties caused by any related litigation involving Tri-State) would not be so direct and immediate as to require Tri-State's joinder in this action. See Angst, 77 F.3d at 705; Sierra Club v. Watt, 608 F. Supp. 305, 324 (E.D. Cal. 1985); 4 James Wm. Moore, supra, § 19.03[3][b], at 19-49; cf. id. § 19.03[4][d], at 19-59 (stating that Fed. R. Civ. P. 19(a)(2)(ii) is designed to avoid inconsistent obligations, not inconsistent adjudications).

A third reason cited by Plaintiffs in support of their motion to join Tri-State is that evidence of Tri-State's activities (*e.g.*, incidents in which a truck strayed from its route or was hit by a drunk driver) may be germane to Plaintiffs' claims against Defendants Westinghouse and CAST. The need to obtain such evidence does not provide a basis for

joinder of Tri-State under Fed. R. Civ. P. 19 because this rule does not require a party to be joined "simply to allow greater discovery." Hefley v. Textron, Inc., 713 F.2d 1487, 1498 (10th Cir. 1983); accord Johnson v. Smithsonian Inst., 189 F.3d 180, 188-89 (2d Cir. 1999). For all of the above reasons, Plaintiffs' motion to join Tri-State as a party Defendant pursuant to Fed. R. Civ. P. 19 is denied.

### D.    Motion to Strike Jury Demand

Plaintiffs' *Final Complaint* [Doc. No. 168] filed on August 31, 2001, demands a jury trial on their public-nuisance claim against the Private Defendants.[7]   On April 5, 2004, Defendants CAST and Westinghouse filed a motion to strike Plaintiffs' jury demand as to all claims asserted against them in the *Final Complaint*.   Although Plaintiffs now concede that they are not entitled to a jury trial with respect to their claims against the Federal Defendants (which have all been dismissed at this juncture), they continue to demand a jury trial on their public-nuisance claim against Defendants CAST and Westinghouse.

Fed. R. Civ. P. 39(a) provides, in relevant part, that when a party has demanded a jury trial in accordance with Fed. R. Civ. P. 38, "the trial of all issues so demanded shall be by jury, unless . . . the court upon motion or of its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States."   In this case, Plaintiffs do not provide any authority in support of a statutory right

---

[7]Plaintiffs' jury demand with respect to their claims against the Federal Defendants was stricken on February 10, 2000. [Doc. No. 65.]

to a jury trial.[8]  Accordingly, the focus of the Court's analysis is on whether Plaintiffs have a constitutional right to a jury trial.

The United States Constitution guarantees the right to a jury trial "[i]n all criminal prosecutions," U.S. Const. amend. VI, and "[i]n suits at common law, where the value in controversy shall exceed twenty dollars," U.S. Const. amend. VII.  The Constitution does not require a jury trial, however, if the action involves rights and remedies of the sort traditionally enforced in an action in equity or admiralty.  See Fischer Imaging Corp. v. Gen. Elec. Co., 187 F.3d 1165, 1168 (10th Cir. 1999).  Thus, whether Plaintiffs have a constitutional right to try their public-nuisance claim before a jury "depends on whether [t]his action is equitable or legal in nature." Manning v. United States, 146 F.3d 808, 811 (10th Cir. 1998).  The nature of the remedy sought is of particular importance in making this determination.  See Fischer Imaging Corp., 187 F.3d at 1168.

In this case, Plaintiffs' *Final Complaint* prays for declaratory and injunctive relief. [Doc. No. 168, at 13.]  The prayer for declaratory relief, however, is only directed at Plaintiffs' NEPA claim against the Federal Defendants, which has been dismissed.  [Doc. No. 295.]  With respect to their public-nuisance claim, Plaintiffs ask the Court to "[g]rant a permanent injunction enjoining Defendants from placing any waste at WIPP because WIPP and the related waste transport are public nuisances." [Doc. No. 168, at 13.]  Thus, the

---

[8]The Declaratory Judgment Act preserves the right to a jury trial but does not entitle a party to a jury trial where the right to a jury trial does not otherwise exist.  See Manning, 146 F.3d at 811.

specific remedy that Plaintiffs seek with respect to their public-nuisance claim is a permanent injunction.

"A key dividing line between law and equity has historically been that the former deals with money damages and the latter with injunctive relief." Hildebrand v. Bd. of Tr. of Mich. State Univ., 607 F.2d 705, 708 (1979). "A public nuisance action was a classic example of the kind of suit that relied on the injunctive relief provided by courts in equity." Tull v. United States, 481 U.S. 412, 423 (1987) (citing W. Prosser, Law of Torts, at 603 (4th ed. 1971)). Thus, both the nature of the cause of action and the remedy sought here compel the conclusion that this action is one in equity to which no constitutional right to a jury trial attaches. See NAACP v. Acusport, Inc., 226 F. Supp. 2d 391, 398 (E.D.N.Y. 2002); accord City of N.Y. v. Beretta U.S.A. Corp., 312 F. Supp. 2d 411, 414 (E.D.N.Y. 2004). For these reasons, I conclude that the motion to strike Plaintiffs' jury demand filed by Defendants CAST and Westinghouse must be granted.[9]

## E.   Effect of the HWA and Prior Proceedings Before the NMED

The specific allegations against Defendant Westinghouse in the *Final Complaint* primarily relate to whether this Defendant has complied with the State of New Mexico's Hazardous Waste Act (HWA), N.M. Stat. Ann. §§ 74-4-1 to 74-4-14 (Michie 2004), and the RCRA permit issued by NMED pursuant to that statute. [Doc. No. 168, at ¶¶ 39 through

---

[9]In reaching this conclusion, I note that the authority cited by Plaintiffs with respect to their claimed right to a jury relate to the issue of whether it would be appropriate to seat an advisory jury under Fed. R. Civ. P. 39(c) or the alternative procedure suggested in City of N.Y., 312 F. Supp. 2d at 414-15. This authority does not establish a constitutional or statutory right to a jury trial.

39g.] Defendant has moved to dismiss the *Final Complaint* on the grounds that these allegations constitute an impermissible collateral attack on the permitting and enforcement decisions made by the NMED. In support of its motion, Defendant Westinghouse asserts that the HWA and its implementing regulations provide the exclusive procedure for challenging the NMED's permitting and enforcement actions in this context. See N.M. Stat. Ann. § 74-4-14 (Michie 2004); N.M. Admin. Code tit. 20, § 20.1.5 (2003). Defendant Westinghouse also contends that this Court should abstain from independently adjudicating the merits of such permitting and enforcement actions, citing the doctrine of primary jurisdiction as well as the doctrine of abstention first articulated in Burford v. Sun Oil Co., 319 U.S. 315 (1943). See Palumbo v. Waste Tech. Indus., 989 F.2d 156, 159 (4th Cir. 1993).

Plaintiffs respond by asserting that this action is not a collateral attack on the RCRA permit issued by the NMED because Plaintiffs are challenging Defendant Westinghouse's compliance with the RCRA permit rather than the permit itself. Plaintiffs further assert that neither the HWA nor related federal environmental laws preempt a cause of action for public nuisance in this context.

I agree with Plaintiffs that their cause of action for public nuisance is not preempted, repealed, or abrogated by the HWA or related federal environmental laws. "In most of the cases . . . involving the creation of administrative procedures to deal with the complex problem of environmental control, arguments that the administrative remedies abrogate long-

35

standing judicial remedies have been rejected, absent a clear legislative intent to the contrary." State ex rel. Norvell v. Arizona Pub. Serv. Co., 85 N.M. 165, 169, 510 P.2d 98, 102 (1973) (citations omitted). Such clear legislative intent does not appear in the HWA, and I conclude that this case presents circumstances in which the common law and statutes regarding public nuisance "ought to remain available." Id. at 170, 510 P.2d at 103; accord Gonzalez v. Whitaker, 97 N.M. 710, 714, 643 P.2d 274, 277 (Ct. App. 1982); see Waste Isolation Pilot Plant Land Withdrawal Act (LWA), Pub. L. No. 102-529, § 14(b), 106 Stat. 4777 (1992), as amended by Pub. L. No. 104-201, 110 Stat. 2422 (1996) (providing, in relevant part, that: "No provision of this Act may be construed to limit, or in any manner affect, . . . the Secretary's obligation to comply with . . . any other applicable clean air or hazardous waste law"); cf. Cook, 273 F. Supp. 2d at 1180-99 (reciting federal preemption doctrines as they relate to nuclear safety). The fact that there are statutes in existence to regulate the same or similar subject matter does not necessarily mean that a plaintiff is precluded from bringing a public-nuisance claim, and conversely, the fact that a defendant may be in violation of a permit or other environmental regulation does not necessarily mean that the defendant's violation has resulted in a public nuisance because the plaintiffs must still establish all other essential elements of their nuisance claim. See State ex rel. Baxter v. Egoff, 107 N.M. 315, 318, 757 P.2d 371, 374 (Ct. App. 1988).

The Private Defendants correctly point out that, under New Mexico law, "due authorization" or "lawful authority" may provide a qualified or absolute defense to a

nuisance claim against a public-works project. See City of Albuquerque II, 119 N.M. at 165-66, 889 P.2d at 200-01; City of Albuquerque I, 111 N.M. at 612, 808 P.2d at 62. The "due authorization" defense, however, depends on a showing of *compliance* with all applicable laws, rules, and regulations, not the mere *existence* of statutes or regulations relating to the same subject matter. See City of Albuquerque II, 119 N.M. at 158, 889 P.2d at 193. Thus, this defense does not deprive this Court of jurisdiction to hear Plaintiffs' public-nuisance claim against the Private Defendants. Rather, the "due authorization" defense presents certain legal issues which must be resolved in order to determine whether Plaintiffs may prevail on the merits of their public-nuisance claim. See id. at 159-60, 889 P.2d at 194-95.

The question remains whether this Court must defer or give preclusive effect to the NMED's administrative actions in resolving these issues regarding the Private Defendants' "due authorization" or compliance with applicable laws such as the HWA. "The basic issue, therefore, is whether the particular public nuisance claim here requires the resolution of [other] issues which have been placed within the special competence of an administrative agency." Id. at 170, 510 P.2d at 103. Additionally, Plaintiffs' use of certain compliance orders and notices of violation issued by the NMED to prove its public-nuisance claim against Defendant Westinghouse raises a question as to whether the doctrine of nonmutual offensive collateral estoppel applies here. See generally DeLisle v. Avallone, 117 N.M. 602, 605, 874 P.2d 1266, 1269 (Ct.App.1994); Shovelin v. Central N.M. Elec. Coop., Inc., 115 N.M. 293, 297-98, 850 P.2d 996, 1000-01 (1993).

I agree with Defendant Westinghouse that issues pertaining to its compliance with the RCRA permit issued by the NMED under the HWA fall within the special competence of that administrative agency. Thus, as a matter of comity, the NMED should be given the opportunity to speak to such issues in the first instance. See Norvell, 85 N.M. at 170-72, 510 P.2d at 103-05. In this case, however, the specific allegations against Defendant Westinghouse in Plaintiffs' *Final Complaint* concern permitting or enforcement actions for which the NMED "has already exercised whatever 'primary jurisdiction' it held." Gonzalez, 97 N.M. at 713, 643 P.2d at 277. In particular, the record reflects that the NMED has already acted to resolve the series of "compliance orders" and "notices of violation" cited by Plaintiffs in support of their argument that Defendant Westinghouse has violated the RCRA permit.[10] [Ex. to Doc No. 205, 208, 279; Ex. to Kehrman Aff. filed as Doc No. 269.]

For these reasons, the Private Defendants have not demonstrated a valid basis for dismissing this action based on the doctrine of primary jurisdiction or related abstention doctrines. Rather, the question presented here is whether or to what extent this Court should defer or give preclusive effect to administrative actions that the NMED already has taken.

Under the doctrine of collateral estoppel, a prior ruling on an issue by an administrative agency may be given preclusive effect in subsequent litigation under a

---

[10]The Court notes that there is a procedural issue relating to the modification of the RCRA permit that remains pending on appeal in the New Mexico Supreme Court, see Southwest Research and Info. Ctr. v. State of N.M., 2003-NMCA-012, 133 N.M. 179, 62 P.3d 270, cert. granted, 132 N.M. 551, 52 P.3d 411 (2002). That issue does not involve a permit violation by Defendant Westinghouse, and Plaintiffs have not demonstrated how that appeal is relevant to this case.

different cause of action if the party against whom such collateral estoppel is sought was also a party (or in privity with a party) to the prior administrative proceeding and had a full and fair opportunity to litigate the issue in that prior proceeding. See, e.g., Padilla v. Intel Corp., 1999-NMCA-125, ¶¶ 9-10, 125 N.M. 698, 964 P.2d 862. In addition, the issue must have been actually litigated and necessarily determined with some degree of finality in the prior proceeding. See Delisle, 117 N.M. at 605, 874 P.2d at 1269.

Without expressly invoking the doctrine of non-mutual offensive collateral estoppel, Plaintiffs seek to use the compliance orders and notices of violation issued by the NMED to establish that Defendant Westinghouse violated the RCRA permit issued pursuant to the HWA, and more generally to prove that Defendant Westinghouse's operation of WIPP results in a public nuisance. Defendant Westinghouse contends that these compliance orders or notices of violation contain mere *allegations* about violations of the RCRA permit or the HWA, which do not constitute proof that any violation occurred or that any public nuisance has resulted.

To determine the meaning of the compliance orders and notices of violation that Plaintiffs have cited in this case, the Court must examine their place in the permitting and enforcement scheme set forth in the HWA and its implementing regulations. Section 74-4-10(A) of the HWA provides that:

> Whenever on the basis of any information the secretary determines that any person has violated, is violating or threatens to violate any requirement of the Hazardous Waste Act, any rule adopted and promulgated pursuant to that act or any condition of a permit issued pursuant to that act, the secretary may:

(1) issue a compliance order stating with reasonable specificity the nature of the violation or threatened violation and requiring compliance immediately or within a specified time period or assessing a civil penalty for any past or current violation, or both; or

(2) commence a civil action in district court for appropriate relief, including a temporary or permanent injunction.

N.M. Stat. Ann. § 74-4-10(A).  Section 74-4-10(H) of the HWA further provides that:

Any order issued pursuant to this section shall become final unless, no later than thirty days after the order is served, the person named in the order submits a written request to the secretary for a public hearing.  Upon such request, the secretary shall promptly conduct a public hearing.  The secretary shall appoint an independent hearing officer to preside over the public hearing.  The hearing officer shall make and preserve a complete record of the proceedings and forward his recommendation based on the record to the secretary, who shall make the final decision.

N.M. Stat. Ann. § 74-4-10(H).

The procedure for conducting the public hearings referenced in Section 74-4-10(H) is set forth in Title 20, Section 20.1.5 of the New Mexico Administrative Code (NMAC). This procedure is invoked by the filing of a "Request for Hearing," which shall include an "Answer" similar to that filed in a civil action under the New Mexico Rules of Civil Procedure. N.M. Admin. Code tit. 20, § 20.1.5.200(A). The Complainant (*i.e.*, the division of NMED that issued the Compliance Order) "has the burden of going forward with the evidence and of proving by a preponderance of the evidence the facts relied upon to show the violation occurred and that the proposed civil penalty is appropriate." Id. tit. 20, § 20.1.5.400(C)(1).

The procedure set forth in the NMAC also provides for and encourages alternate

40

resolution by means of settlement. See id. tit. 20, § 20.1.5.600(B). These settlement procedures authorize the Secretary of the NMED to "approve a Stipulated Final Order signed by all the parties." Id. In addition, the "Respondent/Complainant may withdraw the Request for Hearing or the Compliance Order at any time prior to a decision by the Secretary." Id.

The procedure for judicial review of the NMED's final decisions with respect to compliance orders is provided in Section 74-4-14(A) of the HWA, which states that: "Any person who is or may be affected by any final administrative action of the board or the secretary may appeal to the court of appeals for further relief within thirty days after the action. All appeals shall be upon the record before the board or the secretary." N.M. Stat. Ann. § 74-4-14(A). "Upon appeal, the court of appeals shall set aside the action only if it is found to be: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Id. § 74-4-14(C).

Under this framework, it is clear that a compliance order does not necessarily constitute a final determination that a violation of the RCRA permit or the HWA occurred. A compliance order does not become final unless and until more than thirty days have passed without a request for hearing, or until the Secretary of the NMED or the New Mexico Court of Appeals issues a final decision affirming the order. Further, when the issues raised in a compliance order are resolved informally without the need to request a hearing, or by means of the settlement procedures set forth in the NMAC, the Court cannot conclude that those

41

issues were "actually litigated" and "necessarily determined" in an administrative proceeding

before the NMED, much less that Defendant Westinghouse had a full and fair opportunity

to litigate those issues. The Court reaches the same conclusion with respect to the "notices

of violation" or other correspondence from the NMED alleging a violation of the RCRA

permit.[11]

For these reasons, this Court will not give preclusive effect to issues raised by the

NMED in the compliance orders, notices of violation, or other NMED correspondence cited

by Plaintiffs in this case.  As explained in further detail in Section II(F)(3) of this

*Memorandum Opinion and Order*, the NMED's subsequent resolution of these issues does

not satisfy all the requirements for the doctrine of collateral estoppel to apply. Rather, the

specific compliance orders, notices of violations, and other documents referenced by

Plaintiffs simply contain allegations and demands by the NMED which have no finality or

preclusive effect in the context of this litigation.

For the purpose of defeating the Private Defendants' motions for summary judgment,

Plaintiffs cannot establish a genuine issue of material fact as to the allegations in their *Final*

*Complaint* simply by citing to similar allegations contained in an administrative pleading

---

[11]Title 20, Section 20.1.5.7(A)(5) of the NMAC defines "Compliance Order" as "a
written administrative order or any field citation issued by the Division." N.M. Admin. Code tit.
20, § 20.1.5.7(A)(5).  The parties point to no separate definition explaining the significance of a
"notice of violation" or other correspondence from the NMED alleging a permit violation. Thus,
the Court concludes that such notices of violation or other correspondence are akin to a demand
letter, and do not constitute final, formal, or fully adjudicated decisions by the Secretary of the
NMED.

filed by the NMED. It is the resolution of the NMED's allegations or demands, rather than their mere existence, that is material in this context.

To the extent that the parties ask the Court to give deference to administrative determinations by the NMED (without giving them preclusive effect), the Court will bear in mind that the procedure for obtaining judicial review of "any final administrative action" by the Secretary of the NMED is to file an appeal with the New Mexico Court of Appeals, and such appeals are based on the administrative record and a standard of review similar to that provided in Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706. See N.M. Stat. Ann. § 74-4-14(C); cf. City of Albuquerque II, 119 N.M. at 157-58, 889 P.2d at 192-93 (explaining deferential standard of review applied to decisions "arrived at through administrative processes"); Atlixco Coalition v. Maggiore, 1999-NMCA-134, ¶¶ 24, 40, 125 N.M. 786, 965 P.2d 370 (noting similarity of state and federal standards of review). The specific actions of the NMED on which the parties rely to support their claims and defenses are reviewed individually in the discussion of the Private Defendants' summary-judgment motions below.

## F.     Merits of Plaintiffs' Public Nuisance Claim

The Court next addresses the merits of Plaintiffs' claim that the activities of Defendants Westinghouse and CAST present a public nuisance. Defendants Westinghouse and CAST have filed a motion to dismiss this claim in its entirety under Fed. R. Civ. P. 12(b)(6). [Doc. No. 194.] In briefing this motion, the parties have submitted documentary

43

evidence in support of their contentions. [Doc. No. 195, 205, 208, 215.] In addition, Defendants Westinghouse and CAST have each filed motions for summary judgment regarding Plaintiffs' public-nuisance claim. [Doc. No. 262, 267.]

### 1.    <u>Standard of Review</u>

The Court reviews this series of motions under the following standards. Dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) is appropriate only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>GFF Corp. v. Associated Wholesale Grocers, Inc.</u>, 130 F.3d 1381, 1384 (10th Cir.1997) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." <u>Miller v. Glanz</u>, 948 F.2d 1562, 1565 (10th Cir.1991). Accordingly, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party. <u>GFF Corp.</u>, 130 F.3d at 1384.

"In addition to the complaint, the . . . [C]ourt may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002). Thus, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be

44

considered on a motion to dismiss." GFF Corp., 130 F.3d at 1384. The Court "'may also take judicial notice of matters of public record' without converting a 12(b)(6) motion into a motion for summary judgment." Henson v. CSC Credit Servs., 29 F.3d 280, 284 (7th Cir. 1994).

To the extent that Defendants' motions refer to other material outside of the pleadings, they are reviewed as motions for summary judgment pursuant to Fed. R. Civ. P. 56. See Fed. R. Civ. P. 12(b). Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. See id. at 248. Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See Celotex Corp., 477 U.S.

at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)). Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions); Lozano v. Ashcroft, 258 F.3d 1160, 1166 (10th Cir. 2001) (refusing to consider declaration that was based on hearsay rather than personal knowledge and did not attach copies of records referenced therein).

In this case, the parties have submitted exhibits, affidavits, and deposition testimony that contain hearsay and hearsay within hearsay. In reviewing these materials to determine whether the Private Defendants are entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed. See Fed. R. Evid. 801(d)(2); Wright-Simmons, 155 F.3d at 1268; Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000). The Court does, however, consider statements attributed to third parties for other admissible purposes. In particular, such statements may be considered for the limited

purpose of showing their effect on the listener or the declarant's state of mind.  See Faulkner

v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright

v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind);

Pastran, 210 F.3d at 1203 n.1 (similar).  They also may be considered as verbal acts or

operative facts when legal consequences flow from the utterance of the statements.  See

generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087

(10th Cir. 2001).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the

Court's role to weigh the evidence, assess the credibility of witnesses, or make factual

findings in ruling on a motion for summary judgment.  Rather, the Court assumes the

admissible evidence of the non-moving party to be true, resolves all doubts against the

moving party, construes all admissible evidence in the light most favorable to the non-

moving party, and draws all reasonable inferences in the non-moving party's favor.  See

Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### 2.    The Law of Public Nuisance in New Mexico

Scholars have remarked that: "There is perhaps no more impenetrable jungle in the

entire law than that which surrounds the word 'nuisance.'  It has meant all things to all

people . . . ."  W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts, ch. 15, § 86,

at 616 (5th ed. 1984) (hereinafter Prosser and Keeton).  Nevertheless, the law of nuisance

has been defined and codified in the hornbook cited above and in the Restatement (Second)

47

of Torts ch. 40 (1979) (hereinafter "Restatement"). The common law of nuisance codified

in these sources has been "carried into New Mexico law." State ex rel. Smith v. Riley, 1997-

NMCA-063, ¶ 6, 123 N.M. 453, 942 P.2d 721; see, e.g., City of Albuquerque II, 119 N.M.

at 163, 165, 889 P.2d at 198, 200 (citing the Restatement's definitions of private and public

nuisances, and citing Prosser and Keeton on the Law of Torts for the general rule regarding

anticipatory nuisances); City of Albuquerque I, 111 N.M. at 611-12, 808 P.2d at 61-62

(similar). This Court relies primarily on reported opinions of New Mexico's appellate courts

and the secondary sources cited therein to determine whether Defendants Westinghouse and

CAST are entitled to summary judgment on Plaintiffs' public-nuisance claim.

>    Under the Restatement's definition of the term, as adopted by New Mexico courts,
>
> >    "for a nuisance to exist there must be harm to another or the invasion of an
> >    interest, but there need not be liability for it. If the conduct of the defendant
> >    is not of a kind that subjects him to liability, the nuisance exists, but he is not
> >    liable for it. In other words, as it is used in the Restatement, 'nuisance' does
> >    not signify any particular kind of conduct on the part of the defendant.
> >    Instead, the word has reference to two particular kinds of harm--the invasion
> >    of two kinds of interests [. . . public v. private]--by conduct that is tortious
> >    only if it falls into the usual categories of tort liability."

Moreno v. Marrs, 102 N.M. 373, 379-80, 695 P.2d 1322, 1328-29 (Ct. App. 1985) (quoting

Restatement, supra, § 821A, cmt. c). Under this definition, "'nuisance is a field of tort

liability, rather than a type of tortious conduct. It has reference to the interests invaded, to

the damage or harm inflicted, and not to any particular kind of act or omission which has led

to the invasion.'" Id. at 379, 695 P.2d at 1328 (quoting W. Prosser, The Law of Torts, at

573-74 (West 4th ed. 1971)). On the most general level, the Restatement divides these

interests into two categories: public and private. See Restatement, supra, § 821A.

Accordingly, my analysis begins by identifying the particular interests that Plaintiffs allege to be invaded by the acts or omissions of Defendants Westinghouse and CAST. Plaintiffs' *Final Complaint* alleges that the "WIPP site and related transportation system are dangerous to the public health" and "the public safety" because of "the potential injurious release of hazardous materials in New Mexico," and that the "opening of the WIPP site and the transport of shipments thereto is a violation and interference with the exercise and enjoyment of the public right of New Mexicans to be protected from transport and storage of hazardous and radioactive wastes." [Doc. No. 168, at ¶¶ 38, 43, 47.] To redress these alleged harms, Plaintiffs seek "a permanent injunction enjoining Defendants from placing any waste at WIPP because WIPP and the related waste transport are public nuisances." [Doc. No. 168, at 13.]

Plaintiffs' allegations concern the invasion of, interference with, or injury to a right common to the general public, *i.e.*, the public health, safety, peace, comfort, convenience, morals, welfare, or right to use public property. See City of Albuquerque II, 119 N.M. at 163, 889 P.2d at 198; N.M. Stat. Ann. § 30-8-1 (Michie 2004); Restatement, supra, § 821B. Accordingly, they are properly characterized as asserting a claim for public nuisance.

In addition to distinguishing between public and private nuisances, New Mexico's appellate courts have drawn distinctions between nuisances *per se* and nuisances in fact, and between anticipatory nuisances and existing nuisances. While the distinction between public

49

and private nuisances depends on the type of interests invaded, these other distinctions are based on the type of acts or omissions which are alleged to cause the nuisance, and the type of relief sought to redress the nuisance.

A nuisance *per se* results from "'an act, occupation, or structure which is a nuisance at all times and under any circumstances.'" Scott v. Jordan, 99 N.M. 567, 570, 661 P.2d 59, 62 (Ct. App. 1983) (quoting Denney v. United States, 185 F.2d 108, 110 (10th Cir. 1950)). A nuisance in fact results from "'an act, occupation, or structure . . . which may become a nuisance by reason of circumstances, location, or surroundings,'" id. (quoting Denney, 185 F.2d at 110), including "the manner in which it is conducted or managed," City of Albuquerque II, 119 N.M. at 164, 889 P.2d at 199.

When an activity or project threatens to cause a nuisance but has not yet resulted in one, it falls under the category of "anticipatory" nuisance. See City of Albuquerque II, 119 N.M. at 165, 889 P.2d at 200 (citing Prosser and Keeton on Torts, supra, § 89, at 640-41); Gonzalez, 97 N.M. at 714, 643 P.2d at 278. An anticipatory nuisance generally does not provide a basis for an award of damages under the rule stated in Section 821F of the Restatement because the recovery of damages in a tort action is limited to those who have in fact suffered significant harm of the kind described in that section. See Restatement, supra, § 821F, cmt. b.

Where injunctive relief is sought, however, the general rule in New Mexico is that "anticipatory nuisance is a valid cause of action," City of Albuquerque II, 119 N.M. at 165,

889 P.2d at 200, and that "ordinarily an injunction will be granted where the act or thing threatened is a nuisance per se, or necessarily will become a nuisance," Gonzalez, 97 N.M. at 714, 643 P.2d at 278. On the other hand, an injunction will not issue where "the apprehended dangers relied upon to constitute a nuisance were doubtful, eventual or contingent, rather than a necessary result or highly probable." Id. (citing Phillips v. Allingham, 38 N.M. 361, 33 P.2d 910 (1934)); see Restatement, supra, § 933, cmt. b (noting that the threat must be "of sufficient seriousness and imminence to justify coercive relief").

In order to obtain injunctive relief in this context, Plaintiffs must show that theirs is an "extreme case[] of pressing necessity . . . where there is . . . irreparable injury for which there is no adequate and complete remedy at law." Scott, 99 N.M. at 572, 661 P.2d at 64; accord Padilla v. Lawrence, 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct. App. 1984). Generally, this requirement means that a "sufficient basis exists to enjoin a nuisance, if the activity complained of is continuous in nature and its frequency or constant reoccurrence renders a remedy at law inadequate except by means of a multiplicity of suits." Scott, 99 N.M. at 572, 661 P.2d at 64. However, the "fact that a nuisance is characterized as continuing does not require the trial court to grant injunctive relief," Padilla, 101 N.M. at 562, 685 P.2d at 970, because a court may find that it is "reasonable to continue an important activity if payment is made for the harm it is causing," Restatement, supra, § 821B, cmt. i.

While it is clear that Plaintiffs are seeking injunctive relief based on a theory of public nuisance in this case, their pleadings and briefs contain some ambiguity as to whether they

are alleging a nuisance *per se* or a nuisance in fact, and as to whether they are alleging an anticipatory nuisance or a existing nuisance.  In their briefs filed in response to the Private Defendants' motion to dismiss [Doc. No. 205, 208], Plaintiffs assert that: "Each of the claims in Count II of the Final Complaint are claims against an *existing* public nuisance," and that Defendant Westinghouse's alleged violation of the RCRA permit "is grounds for a determination that the operation of the WIPP site is a nuisance *in fact*." [Doc. No. 205, at 15, 16 (emphasis added).]  In their brief filed on May 11, 2004, in response to Defendant Westinghouse's motion for summary judgment, Plaintiffs repeatedly assert that the parties have "submitted evidence that demonstrates conduct by the Defendant that was a violation of law sufficient to indicate a nuisance *per se*." [Doc. No. 284, at 9, 10.]

Plaintiffs' pleadings and briefs also contain some ambiguity with respect to the interests they claim are invaded by the Defendants' activities.  On the one hand, Plaintiffs allege and attempt to show that the Private Defendants' activities present a tangible, physical threat to public health and safety that has a scientific foundation and is grounded in fact.  On the other hand, Plaintiffs also allege and attempt to show purely psychological harms of the type discussed in the comments to Section 821F of the Restatement, even though that section applies to tort liability in an action for damages and Plaintiffs are not seeking damages here.

In order to resolve these ambiguities, the Court will first organize the various iterations of Plaintiffs' public-nuisance claim into four general theories and determine which of these theories are viable under New Mexico law.  For those theories that are viable, the

52

Court then examines the specific evidence Plaintiffs have presented in support of their claim against each remaining Defendant in order to determine whether a genuine issue of material fact precludes summary judgment under the applicable law.

The first theory articulated in Plaintiffs' pleadings and briefs is that WIPP presents some form of public nuisance because it is a source of fear and anxiety among members of the public, regardless of whether such psychological harms have any scientific foundation or basis in fact. The second theory articulated by Plaintiffs is that activities involving the transportation or disposal of radioactive or hazardous waste present an unacceptable physical danger to the public health and safety that constitutes a nuisance *per se* or an anticipatory nuisance in fact. Plaintiffs' third theory is that even if the waste associated with WIPP does not present a nuisance *per se* or an anticipatory nuisance in fact, Defendants Westinghouse and CAST are handling that waste in such a careless or lawless manner as to present an existing nuisance in fact. The fourth theory articulated by Plaintiffs is that regardless of the presence or absence of hazardous or radioactive waste, the activities of Defendants Westinghouse and CAST present a public nuisance because they are not in compliance with the law applicable to the general public. As explained below, Plaintiffs' first and second theories are not viable in this context as a matter of law. The third and fourth theories require further analysis because they are more dependent on the specific evidence presented with respect to each Defendant.

I first address the theory that a public-nuisance claim for injunctive relief may be

based on psychological harm such as an unfounded fear or anxiety about the Private Defendants' activities relating to hazardous or radioactive waste. Other courts have addressed a similar theory in a different context where private parties sought damages based on these types of psychological harms. See Cook, 273 F. Supp. 2d at 1201-03; City of Santa Fe v. Komis, 114 N.M. 659, 662-63, 845 P.2d 753, 756-57 (1992).

In Cook, landowners adjacent to the Rocky Flats Nuclear Weapons Plant asserted a claim for private nuisance under Colorado law based on allegations of interference with their use and enjoyment of their lands. Quoting Prosser and Keeton, supra, § 87, at 620, the Cook court observed that "'virtually any disturbance of the enjoyment of property may amount to a nuisance' so long as it is substantial and unreasonable from the perspective of a normal person." Cook, 273 F. Supp. 2d at 1203. Thus, the Cook court reasoned that

> the existence of contamination on a property may constitute a nuisance, even if it does not pose a currently measurable or verifiable risk to the property or its occupants, if the jury finds that the contamination, alone or in combination with other alleged factors of interference, would cause a normal member of the community in the same or similar circumstances to experience sufficient fear, anxiety or other discomfort that the community member would find the contamination (and/or other factors of interference) seriously offensive, annoying or inconvenient.

Id. at 1204; see Restatement, supra, § 821F, cmt. d, f; Prosser and Keeton, supra, § 87, at 620, and § 88, at 629.

The New Mexico Supreme Court adopted a similar rule in Komis, 114 N.M. at 662-63, 845 P.2d at 756-57. The Komis case arose from a partial condemnation proceeding in which a portion of a private landowner's property was taken for the purpose of constructing

54

one of the highways used to transport waste to the WIPP facility. See id. at 661, 845 P.2d at 755. In addition to determining the value of the condemned portion of the property, it was necessary to determine the proper method for calculating any diminution in the market value of the remaining property that would result from its proximity to the new highway. The New Mexico Supreme Court concluded that

> if loss of value can be proven, it should be compensable regardless of its source. Thus, if people will not purchase property because they fear living or working on or near a WIPP route, or if a buyer can be found but only at a reduced price, a loss of value exists. If this loss can be proven to the jury, the landowner should be compensated.

Id. at 662-63, 845 P.2d at 756-57. In Komis, the evidence presented by the property owner to support a claim for damages under this theory included, among other things, the results of public-opinion polling conducted by an individual with a Ph.D. in sociology and the expert opinion of an appraiser linking those results with the value of the property in question. See id. at 663-65, 845 P.2d at 757-59.

Plaintiffs have presented nothing of the sort here. Rather, Plaintiffs simply cite a series of affidavits that they previously submitted with their reply brief regarding their NEPA claim against the Federal Defendants. [Doc. No. 275, at 9-10, citing Ex. 8 through 22 to Doc No. 173.] While the fears and anxieties of a small group of individuals are sincerely expressed in these affidavits, standing alone they do not support a reasonable inference that such fears and anxieties are representative of "normal persons living in the community," Restatement, supra, § 821F, cmt. d, much less that feelings of this nature correlate in some

55

measurable way with real and appreciable impacts on property values in any particular area, see Komis, 114 N.M. at 663-65, 845 P.2d at 757-59; Restatement, supra, § 821F, at cmt. c (stating that there is liability for a nuisance only to those to whom it causes "harm of importance, involving more than slight inconvenience or petty annoyance").

Moreover, unlike the property owner in Komis or the landowners adjacent to the Rocky Flats Plant, Plaintiffs in this case do not seek compensation for conduct that interferes with the use and enjoyment of private property. Thus, it is unnecessary to calculate the market value of specific parcels of property based on public perceptions about the shipment of radioactive or hazardous waste to the WIPP site. See Phillips, 38 N.M. at 367, 33 P.2d at 913 (stating that a "mere decrease in the value of complainant's property is not alone sufficient" to warrant injunctive relief).

The viability of Plaintiffs' public-nuisance claim for injunctive relief depends on proof of actual or threatened harm to the public health or safety, not on individual perceptions or feelings that have no scientific foundation or basis in fact. See Restatement, supra, § 821F, cmt. b (noting that the "rule stated in this Section applies only to tort liability in an action for damages"). The fact that Plaintiffs' members "entertain apprehension" over WIPP's presence in New Mexico "does not entitle them to injunctive relief except as the facts may reasonably warrant such apprehension. Even then it is the danger itself, not an entertained fear of it, which furnishes the true basis for injunction." Phillips, 38 N.M. at 368, 33 P.2d at 914-15.

56

In this respect, there is a "fundamental distinction between entitlement to damages and entitlement to abatement of the nuisance." Prosser and Keeton, supra, §88A, at 631. The legal standards for each remedy differ because:

> In determining whether to award damages, the court's task is to decide whether it is unreasonable to engage in the conduct without paying for the harm done. Although a general activity may have great utility it may still be unreasonable to inflict the harm without compensating for it. In an action for injunction the question is whether the activity itself is so unreasonable that it must be stopped. It may be reasonable to continue an important activity if payment is made for the harm it is causing, but unreasonable to continue it without paying.

Restatement, supra, § 821B, cmt. i.

Komis presented a situation in which it was unreasonable to condemn part of a landowner's property for the purpose of constructing a transportation route for hazardous or radioactive waste without paying for the taken property as well as the diminution in value of the remaining property, including the diminution attributable to the public perceptions noted above. This case presents a fundamentally different situation because Plaintiffs are seeking injunctive relief (rather than damages) based on a theory of public nuisance (rather than a taking of private property).

In addition to Komis, I must consider the New Mexico appellate courts decisions in City of Albuquerque I, 111 N.M. 608, 808 P.2d 58, and City of Albuquerque II, 119 N.M. at 165-66, 889 P.2d at 200-01. In reaching those decisions, New Mexico's appellate courts recognized that the viability of a civil action to enjoin a public nuisance may depend on whether the activity in question is a public works project or a private construction project.

"[W]hen a complaint of public nuisance is raised, public works projects are fundamentally different from private construction projects. A public project carries with it the presumption that it is for the public good." City of Albuquerque II, 119 N.M. at 164, 889 P.2d at 199. "The presumption is that the project is publicly scrutinized and balanced against all interests, public and private, upon which it will have an impact." Id. at 164-65, 889 P.2d at 199-200.

Further, a "public works project, unlike a private construction project, is a product of the exercise of the legislative power." Id. at 164, 889 P.2d at 199. Thus, in ruling on whether a public works project should be enjoined because it will result in a public nuisance, courts must be mindful of the division of powers between the Judiciary and other branches of government. While executive and legislative acts are subject to judicial review, the "scope and timing of that review have specific limits." Id. at 156, 889 P.2d at 191. "Generally, the courts will not inquire into the wisdom of legislative or executive decisions, or substitute their views for those of other departments or entities." City of Albuquerque I, 111 N.M. at 613, 808 P.2d at 63.

In accordance with these principles, the New Mexico Court of Appeals has concluded that "acts which the law authorizes to be done, if carried out and maintained in the manner authorized by law, where a public entity acts under its governmental authority, do not constitute public nuisances per se." Id. at 612, 808 P.2d at 62. The New Mexico Supreme Court has further concluded that "due authorization" is an absolute defense to a claim of anticipatory nuisance in fact and a qualified defense to a claim of present nuisance in fact in

this context. City of Albuquerque II, 119 N.M. at 165-66, 889 P.2d at 200-01.

The term "duly authorized" means that the public works project in question "conforms with *all* the federal, state, and local laws, rules, and regulations pertinent to that particular project." Id. at 158, 889 P.2d at 193. In this context, the term "duly authorized" is synonymous with the term "lawful authority" as it appears in New Mexico's public nuisance statute. See id. at 165, 889 P.2d at 200 (citing N.M. Stat. Ann. § 30-8-1). "The existence of lawful authority to construct or carry out a public works project is a legal question." City of Albuquerque I, 111 N.M. at 614, 808 P.2d at 64.

Because WIPP is a public works project and public works projects are presumed to be valid exercises of legislative and executive power, the burden of proving that WIPP is not "duly authorized" falls upon the Plaintiffs. See City of Albuquerque II, 119 N.M. at 157, 158, 889 P.2d at 192, 193. Accordingly, Plaintiffs must come forward with evidence to show that the activities of Defendants Westinghouse and CAST are not "duly authorized" as to those aspects of their public-nuisance claim which are subject to this defense. See Adler, 144 F.3d at 670-72. Plaintiffs also must come forward with evidence to support each of the other elements of their public-nuisance claim, as the violation of a statute or ordinance, standing alone, does not necessarily mean that the activity in question presents a nuisance. See State v. Davis, 65 N.M. 128, 132, 333 P.2d 613, 616 (1958); Egolf, 107 N.M. at 318, 757 P.2d at 374.

In this case, the "due authorization" defense is dispositive with respect to Plaintiffs'

second theory of public nuisance, *i.e.*, that any activity involving hazardous or radioactive waste presents a danger to public health and safety that constitutes a nuisance *per se* or an anticipatory nuisance in fact. This Court previously addressed this theory, as well as the "due authorization" defense, in the *Memorandum Opinion and Order* [Doc. No. 68] filed on March 9, 2000. The Court ruled that the allegations in Plaintiffs' *Second Amended Complaint* [Doc. No. 20] could not support a claim of nuisance *per se* against the Private Defendants because Plaintiffs failed to provide specific, well-pleaded allegations that the operation of WIPP is not duly authorized. However, the Court later permitted Plaintiffs to amend their pleading one last time in order to add allegations to the effect that the activities of Defendants Westinghouse and CAST result in an existing nuisance in fact because they are carried out in a manner that is not duly authorized. [Doc. No. 108, 165.]

Nothing in the *Final Complaint* or in the evidence submitted by the parties changes the Court's earlier conclusion that Plaintiffs do not have a viable cause of action against the Private Defendants on a theory of nuisance *per se*. In order to prevail on such a theory, Plaintiffs must prove that WIPP is a nuisance "'at all times and under any circumstances, regardless of location or surroundings.'" City of Albuquerque II, 119 N.M. at 164, 889 P.2d at 199 (quoting 58 Am. Jur. 2d Nuisances § 18 (1989)). In other words, Plaintiffs must prove that the act of constructing and operating WIPP "necessarily will become a nuisance" because it involves radioactive or hazardous waste, regardless of what precautions are taken or where the waste is located. Gonzalez, 97 N.M. at 714, 643 P.2d at 278 (citing Phillips,

60

38 N.M. at 365, 33 P.2d at 913).

As such, this theory of public nuisance constitutes a challenge to the Federal Government's "authority to construct and operate" WIPP in the first place. City of Albuquerque I, 111 N.M. at 614, 808 P.2d at 64. Due authorization a complete defense to this theory of public nuisance because there is no question that WIPP was constructed and put into operation pursuant to lawful authority, and that the Private Defendants commenced their operations pursuant to lawful contracts with the Federal Government. The Court will not enjoin the operation of WIPP simply because it involves the transportation and disposal of radioactive or hazardous waste.

As in City of Albuquerque II, 119 N.M. at 158, 889 P.2d at 193, the authorization of the project at issue here "involves a complex lattice of laws and regulations" covering a broad range of issues and agencies. The construction and operation of WIPP was specifically authorized by Congress in the Waste Isolation Pilot Plant Land Withdrawal Act (LWA), Pub. L. No. 102-529, 106 Stat. 4777 (1992), as amended by Pub. L. No. 104-201, 110 Stat. 2422 (1996)). As detailed in the history of litigation set forth in the Court's prior Memorandum Opinion and Order [Doc. No. 295] addressing Plaintiffs' NEPA claim against the Federal Defendants, courts and administrative agencies have repeatedly determined that WIPP was constructed and put into operation pursuant to lawful authority. This point is further emphasized in the EPA's Determination of the Waste Isolation Pilot Plant's Compliance with Applicable Federal Environmental Laws for the Period 2000 to 2002, 68

61

Fed. Reg. 25,032 (May 9, 2003). [Ex. to Kehrman Aff. filed as Doc No. 269.] For these reasons, the Private Defendants are entitled to summary judgment on Plaintiffs' second theory of public nuisance articulated above.

Plaintiffs' third and fourth theories of public nuisance both involve allegations of an existing nuisance *in fact* that present a more complex question requiring further analysis. A public works project may result in a nuisance in fact if it is "operated or maintained" in a manner that is not duly authorized. City of Albuquerque I, 111 N.M. at 614, 808 P.2d at 64 (citing State ex rel. N.M. Water Quality Control Comm'n v. City of Hobbs, 86 N.M. 444, 525 P.2d 371 (1974)); accord City of Albuquerque II, 119 N.M. at 164, 889 P.2d at 199. In this case, Plaintiffs' *Final Complaint* alleges that the Private Defendants' operational activities with respect to WIPP are being carried out in an unlawful manner in two respects. Under their third theory of public nuisance, Plaintiffs allege that the Private Defendants are violating laws that are specific to the handling of hazardous or radioactive waste, such as those codified in the RCRA permit issued and administered by the NMED. Under Plaintiffs' fourth theory, they allege that the Private Defendants are violating laws applicable to the general public which have no particular relationship to hazardous or radioactive waste, such

as the violation of speed limits or other traffic regulations on state highways.[12]

While these allegations conceivably could withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs can no longer rest on the allegations in their pleadings at this stage of the litigation. As the party bearing the burden of proof with respect to each element of their public-nuisance claim, including the issue of "due authorization" or "lawful authority," Plaintiffs must come forward with evidence that is sufficient to defeat the Private Defendants' summary judgment motions. See Adler, 144 F.3d at 670-72.

Plaintiffs cannot satisfy this burden simply by alleging the violation of a general "public right of New Mexicans to be protected from transport and storage of hazardous and radioactive wastes," or claiming in a vague and unspecified way that the Private Defendants have acted "in contravention of Article II, Sections 3, 4 and 18 of the New Mexico Constitution." [Doc. No. 168, ¶¶ 47, 49.] Rather, Plaintiffs must identify the specific activity which they claim to be in violation of a particular law, and provide citations to the evidence of record and legal authority in support of that claim. See Tran v. Trs. of the State

---

[12]In some instances, Plaintiffs erroneously refer to the alleged violations of permit conditions and other regulations as "a nuisance *per se*." [Doc. No. 284, at 9, 10.] These references appear to confuse the term "nuisance *per se*" with the concept of "negligence *per se*." While a violation of a permit or regulation may constitute "negligence *per se*," see Prosser and Keeton on the Law of Torts, supra, § 36, at 220, such a violation does not necessarily amount to a "nuisance *per se*" under the definitions provided above. Violation of a statute may constitute negligence *per se* if the statute prescribes the relevant standard of conduct required of a reasonable person and the violation shows that a particular act or omission breaches that standard. See id. The definition of a nuisance, on the other hand, "'refers to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion.'" Moreno, 102 N.M. at 379, 695 P.2d at 1328 (quoting Restatement, supra, § 821A, cmt. c); cf. Padilla, 101 N.M. at 560, 685 P.2d at 968 ("[L]iability for nuisance, unlike liability for negligence, exists regardless of the degree of care exercised to avoid injury.").

Colls., 355 F.3d 1263, 1266 (10th Cir. 2001); cf. State v. Gomez, 1997-NMSC-006, ¶ 23,

122 N.M. 777, 932 P.2d 1 (explaining requirements for preserving novel issues of state

constitutional law).  In accordance with these principles, I next examine Plaintiffs' theories

of existing nuisance in fact as they specifically pertain to each of the remaining Defendants.

### 3.    Plaintiffs' Claim Against Defendant Westinghouse

The third theory of public nuisance articulated in Plaintiffs' *Final Complaint* alleges

that certain activities of Defendant Westinghouse are "without lawful authority" because

they are conducted in violation of the RCRA permit issued by NMED or are otherwise in

violation of the HWA and/or related environmental laws.  I first examines the evidence

submitted with respect to each alleged violation, and then I address the broader issue of

whether the evidence as a whole presents a genuine issue of material fact that is sufficient

to defeat Defendant Westinghouse's motion for summary judgment.

**Paragraph 39(a):** Plaintiffs' *Final Complaint* alleges that Defendant "Westinghouse

accepted mixed (hazardous and radioactive) waste (Waste Stream Profile INW 276) at the

WIPP site before the site was permitted under [RCRA] to accept mixed waste." [Doc. No.

168, at ¶ 39A.] To support this allegation, Plaintiffs cite Administrative Compliance Order

No. HRM-99-04 (CO) dated April 20, 1999, which contains findings by the NMED

pertaining to Waste Stream Profile INW276. [Ex. 1 to Doc No. 279[13]; Zappe Dep. at 85.] Plaintiffs also attempt to distinguish their allegations in Paragraph 39(a) from those asserted in State ex rel. Madrid v. Richardson, 39 F. Supp. 2d 48 (D.D.C. 1999), by claiming that the holding in that case was limited to a different waste stream (TA-55-43). [Doc. No. 284.]

Defendant Westinghouse responds that Administrative Compliance Order No. HRM-99-04 (CO) does not establish a violation of the HWA or any other law because the issues raised therein were resolved by means of a Certification of Compliance issued by the NMED on June 29, 1999. The Certification of Compliance states that the Respondent (U.S. Department of Energy) "submitted an adequate hazardous waste determination for Waste Stream Profile INW276" and that on "May 19, 1999, Respondent filed an Answer and Request for a Hearing." [Ex. to Kehrman Aff. filed as Doc No. 269.] Defendant Westinghouse further responds that the issue of whether WIPP had "interim status" under RCRA at the time of the first shipment regulated by that statute was conclusively resolved by Judge Penn's ruling in Richardson, 39 F. Supp. 2d at 51-52.

I agree with Defendant Westinghouse's position on this issue. Judge Penn's ruling in Richardson was not limited to waste shipment TA-55-43; it also encompassed the issue of interim status under RCRA. The State of New Mexico was a party in Richardson and is

---

[13]Plaintiffs claim to have experienced problems in copying some of the exhibits referenced in their response to Defendant Westinghouse's motion for summary judgment [Doc. No. 278]; however, copies of some of the documents referenced therein were previously filed with the Court as exhibits to Plaintiffs' response to the Private Defendants' motion to dismiss. [Doc. No. 205, 208.] The Court considers these previously filed exhibits as well in ruling on the pending motions for summary judgment.

therefore bound by its result. Moreover, the Court finds Judge Penn's reasoning to be persuasive on this point, and the Court would reach the same result in this case even if Judge Penn's ruling had no preclusive effect here. As a matter of law, WIPP had interim status *during the period in question and therefore was not operating without a permit in violation* of RCRA or the HWA during this period.

Neither Administrative Compliance Order No. HRM 99-04 (CO) nor the deposition testimony cited by Plaintiffs establish any violation of law with respect to the issues raised therein, including the status of Waste Stream Profile INW276. As previously explained in Section II(E) of this *Memorandum Opinion and Order*, the compliance order in question is not final and has no preclusive effect under the enforcement procedure set forth in Section 74-4-10 of the HWA, because Defendant Westinghouse filed an Answer and a Request for Hearing, and the issues raised therein were subsequently resolved by means of the Certification of Compliance. In light of the findings set forth in the Certification of Compliance, Plaintiffs have not met their burden of showing a genuine issue of material fact as to whether Defendant Westinghouse's activities were undertaken without lawful authority.

**Paragraph 39(b):** Plaintiffs' *Final Complaint* alleges that Defendant "Westinghouse accepted waste for storage that was mis-characterized in violation of" RCRA. To support this allegation, Plaintiffs cite deposition testimony of the staff manager of NMED's Hazardous Waste Bureau, Orvil Zappe, which refers to additional compliance orders issued by the NMED. Again, the deposition testimony and compliance orders cited therein do not

establish that Defendant Westinghouse violated the law because the compliance orders are

not final and have no preclusive effect under the enforcement procedure set forth in Section

74-4-10 of the HWA. Mr. Zappe acknowledged this fact in his deposition testimony when

he stated that: "of the compliance orders that we've looked at, we haven't addressed how

they were settled or eventually concluded. So not having that information here, I don't know

how we dealt with this or how it came to a conclusion." [Zappe Dep. at 82.] In this regard,

defense counsel raised a valid objection to the questioning by Plaintiffs' counsel "in that the

only thing mentioned in the questioning was an alleged violation, and nothing presented to

the witness regarding . . . resolution of those alleged violations." [Zappe Dep. at 82.]

Further review of the record reveals that Administrative Compliance Order No. HWB

01-08, referenced on Page 80 of Mr. Zappe's deposition transcript, was resolved by means

of a settlement agreement between the parties which states that: "In accordance with the

schedule of compliance in the compliance order, the Respondents provided the NMED with

sufficient technical justification demonstrating that the headspace gas data for the containers

in question have been analyzed in compliance with the waste analysis plan (WAP)." [Ex.

to Kehrman Aff. submitted as Doc No. 269.] Administrative Compliance Order No. 99-05

(CO), referenced on Page 9 of Plaintiffs' response brief [Doc. No. 277], was resolved by

means of a Stipulated Final Order that incorporates Defendant Westinghouse's Answer and

Request for a Hearing, and dismisses the Administrative Compliance Order as to all claims.

[Ex. to Kehrman Aff. filed as Doc No. 269.]

As noted above, the enforcement procedure set forth in the NMED's implementing regulations provides for the resolution of compliance orders by means of settlement agreements, including stipulated final orders.   See N.M. Admin. Code tit. 20, § 20.1.5.600(B) (2003). As Defendant Westinghouse invoked the hearing process set forth in Section 74-4-10 of the HWA and resolved the allegations in the compliance orders by means of the settlement procedures set forth in the New Mexico Administrative Code, the compliance orders cited by Plaintiffs do not establish any violation of law by Defendant Westinghouse. The administrative record regarding these compliance orders only shows that the issues raised by the NMED were resolved to the agency's satisfaction within a reasonable period of time. When, as here, there exists an administrative enforcement scheme that provides an adequate remedy at law, the requirements for granting injunctive relief are not satisfied.

**Paragraph 39(c):** Plaintiffs' *Final Complaint* alleges that Defendant Westinghouse engaged in "storage of waste that was mixed hazardous and radioactive waste when the permit did not allow for such storage." To support this allegation, Plaintiffs again cite the deposition testimony of Mr. Zappe and the compliance orders referenced therein. The Administrative Compliance Orders numbered 99-04, 99-05, and 01-08 do not establish any violation of law by Defendant Westinghouse for the reasons previously stated.

The only other documents of this nature referenced by the parties are: (1) a "letter of violation" dated August 17, 1999, (2) a "notice of violation" letter dated September 24,

2001, (3) and a "notice of violation" letter dated February 19, 2003. [Unnumbered Ex. to Doc. No. 208.] Defendant Westinghouse contends that these documents do not establish a violation of law because: (1) the "letter of violation" dated August 17, 1999, was resolved informally as stated in the NMED's "Response to Notice of Violation" dated July 7, 2000 [Ex. to Kehrman Aff. filed as Doc No. 269]; (2) the "notice of violation" letter dated September 24, 2001, was resolved without the need for formal enforcement action [Kehrman Aff. filed as Doc No. 269]; and (3) the "notice of violation" letter dated February 19, 2003, was rescinded by NMED on the same date it was issued [Ex. to Kehrman Aff. filed as Doc No. 269].

The Court agrees that the documents referenced in the preceding paragraph do not establish a violation of law by Defendant Westinghouse; rather, they show that the issues raised therein were resolved to the NMED's satisfaction. The "notices of violation" and "letter of violation" are analogous to demand letters; they do not initiate any formal enforcement action in and of themselves. Rather, they threaten to initiate formal enforcement action in the event that the recipient does not comply with their demands within a specified period. Here there is no indication in the record that Defendant Westinghouse failed to comply with the demands stated in the documents in question or that the NMED found it necessary to initiate any formal enforcement action pursuant to Section 74-4-10 of the HWA regarding the issues raised therein. Accordingly, these documents have no finality or preclusive effect with respect to this litigation, and Plaintiffs have not established a

violation of law by Defendant Westinghouse.

**Paragraph 39(d):**  Plaintiffs' *Final Complaint* alleges a "failure to conduct the number and breadth of inspections of waste required by the RCRA permit thus increasing the likelihood of mixing wastes in a hazardous manner and causing the likelihood of the release of hazardous wastes."  [Doc. No. 168, at ¶ 39(d)]  To support this allegation, Plaintiffs cite portions of Mr. Zappe's deposition testimony, as well as certain exhibits to that deposition, which do not directly address the issue of inspections.  In response to this allegation, Defendant Westinghouse cites another portion of Mr. Zappe's deposition testimony where he states that: "To my knowledge, there have been no violations of the requirements either for inspection frequency or inspection records." [Zappe Dep. at 20.]

The portion of the deposition testimony quoted above is directly on point, and the Court finds nothing in the evidence cited by Plaintiffs that contradicts this quoted portion of Mr. Zappe's deposition testimony.  To dispute this point, Plaintiffs rely on the argument that Defendant Westinghouse has not established an exact number for the frequency of inspections referenced in Mr. Zappe's deposition testimony, or "whether Mr. Zappe was even referring to the number and breadth of inspections of waste required by RCRA in his testimony." [Doc. No. 284, at 11.]

Plaintiffs' argument is not persuasive because it misstates the burden of proof with respect to Defendant Westinghouse's motion for summary judgment. See Adler, 144 F.3d at 671-72. In order to defeat this motion, it is Plaintiffs' burden to come forward with

70

evidence to support each essential element of their public-nuisance claim, including the contention that Defendant Westinghouse acted "without lawful authority" or "due authorization." See City of Albuquerque II, 119 N.M. at 157, 158, 889 P.2d at 192, 193 (stating that the burden of proving that a public works project is not "duly authorized" is on "those who claim the decision is invalid"); N.M. Stat. Ann. § 30-8-1 (establishing "without lawful authority" as an element of a public-nuisance claim). The nonmovant also bears the burden of identifying the portions of the record on which they rely to support their contention that summary judgment is not warranted. See Adler, 144 F.3d at 671-72. The Court has a "limited and neutral role in the adversarial process," and this role does not include "comb[ing] the record of previously available evidence and mak[ing] a party's case for it." Id. at 672. Plaintiff has not met its burden here, and thus Defendant Westinghouse is entitled to summary judgment with respect to the allegations in Paragraph 39(d) of the Final Complaint.

**Paragraph 39(e):** Plaintiffs' *Final Complaint* alleges that Defendant Westinghouse is "[k]nowingly using storage drums that are not the ones which were tested and allegedly proven safe in the event of roof falls in the storage panels at WIPP." Plaintiffs contend that this allegation is significant because "experts have testified that there is a strong likelihood of roof fall within one to two years," and thus Defendant Westinghouse "is knowingly exposing workers and the public to unacceptably high potentials for puncture of the drums and contamination within and beyond the WIPP site in violation of" federal environmental

laws. [Doc. No. 168, at ¶ 39(c).]

To support these concerns about the potential for roof fall and its impact on the safety of the storage drums, Plaintiffs rely heavily on the deposition testimony of Dr. Chaturvedi, a scientist who was employed by the Environmental Evaluation Group (EEG) during the relevant time period. Dr. Chaturvedi's deposition testimony, however, does not support Plaintiffs' position on this issue.

Dr. Chaturvedi explained at his deposition that the EEG's concern about the "robustness" of the drums and the potential for "roof fall" related only to a specific portion of WIPP's underground facility identified as "Panel 1." [Chaturvedi Dep. at 42.] Since Panel 1 was excavated much sooner and has been in existence much longer than the other panels, the EEG had expressed a concern that there would be a greater potential for the roof of that panel to collapse on the drums as they were being stored on the floor, causing the drums to rupture while workers were present in the area. [Chaturvedi Dep. at 42-45, 54.] This concern "went away," however, because the Federal Defendants provided "engineering measures," such as "rock bolts and wire mesh" to ensure that the roof in Panel 1 would not collapse, and that panel was successfully filled with drums of waste without any instances of "roof fall." None of the other panels presented similar concerns about roof fall because they were excavated more recently. [Chaturvedi Dep. at 45-49, 55, 57, 59, 66-67.]

Once Panel 1 was filled with drums of waste, the EEG no longer was concerned about the integrity of the drums or the potential for roof fall in that panel because "[t]he drums are

expected to get crushed and breach after the repository is closed.  That is something that is planned to happen." [Chaturvedi Dep. at 43.]  More specifically,

> after the drums are placed underground and the panel is closed, it is expected that the creep of salt, the plastic movement of salt and even occasional brittle movement, like collapse of the roof, that will happen after the repository is closed.  And after the repository is closed, there is not that much space left above the three-stacked drum and two-foot-thick magnesium oxide bag.  So the magnesium oxide, which is the backfill, is expected to cushion the movement of any sudden or brittle movement, such as a chunk of rock breaking loose from the roof; it would be cushioned by the magnesium oxide.

[Chaturvedi Dep. at 44.]

Having failed to elicit deposition testimony from Dr. Chaturvedi in support of their position, Plaintiffs fall back on the argument that they should be granted leave to continue their efforts to obtain additional evidence on this issue.  [Doc. No. 284, at 12.]  This argument lacks merit.  Plaintiffs already have been given more than five years to gather evidence in support of their contentions, and the Court already provided Plaintiffs with an adequate opportunity obtain additional evidence regarding the allegations in Paragraphs 39 through 39(g) of their *Final Complaint* during the period when discovery was reopened. Further requests for additional discovery or delay are untimely and do not provide a basis for denying Defendant Westinghouse's motion for summary judgment on this issue.

**Paragraph 39(f):** Plaintiffs' *Final Complaint* alleges that Defendant Westinghouse is "[o]perating WIPP while two gallons of water per minute have been flowing out of the underground formation known as the Dewey Lake Redbeds and through the main exhaust shaft at the site, preventing proper monitoring of the radioactivity of the site in violation of

the Atomic Energy Act." To support this allegation, Plaintiffs point to the deposition testimony of Mr. Zappe and Dr. Chaturvedi, the declarations of two of Plaintiffs' experts, Dr. Marvin Resnikoff and Mr. Bernd Franke, and an excerpt from a report entitled "*Evaluation of the Eberline Alpha-6 Continuous Air Monitor for Use in the Waste Isolation Pilot Plant.*" [Exs. to Doc. No. 279.]

Mr. Zappe's deposition testimony regarding this issue is hearsay because he candidly admits he has "no firsthand knowledge of it." The NMED's authority and expertise is limited to the VOC monitors, for which Mr. Zappe concludes "there have not been any exceedances." [Zappe Dep. at 70-72.] As for the radiological monitoring referenced in Paragraph 39(f) of Plaintiffs' *Final Complaint*, Plaintiffs present no testimony or documentation on point from any regulatory agency possessing the requisite authority and expertise to identify and adjudicate a violation of the Atomic Energy Act.

Dr. Chaturvedi's deposition testimony also does not support Plaintiffs' allegations with respect to radiological monitoring at the main exhaust shaft. Dr. Chaturvedi stated at his deposition that: "The radiation monitors at Station A have been found to be clogged with dust, and they have had to be changed frequently." [Chaturvedi Dep. at 68.] Nevertheless, Dr. Chaturvedi explained that the monitors still work and that the problem is remedied by changing them more frequently. He described the clogging problem as an "inconvenience" rather than a "malfunction." [Chaturvedi Dep. at 68-69.]

This assessment is not contradicted to any significant degree in the declarations of Dr.

74

Resnikoff and Mr. Franke, nor in the other exhibits filed by Plaintiffs in this case. Rather, these sources simply confirm the problem, *i.e.*, that the monitors will not function properly if they are allowed to clog with a build-up of dust or salt. That is why, as indicated in Dr. Chaturvedi's deposition testimony, the monitors are changed frequently to prevent such build-up.

Moreover, Plaintiffs' evidence regarding the technical problems with the radiological monitoring at the main exhaust shaft does not support a reasonable inference that Defendant Westinghouse is violating a condition of the RCRA permit administered by the NMED or otherwise operating "without lawful authority." Indeed, this radiological monitoring is not within the NMED's jurisdiction, as Mr. Zappe candidly admits in his deposition testimony.

Under similar circumstances, the New Mexico Supreme Court has declined to "pretend" that its knowledge of such technical issues is superior to that of the administrative agencies and their experts who have debated and collaborated on a public works project. See City of Albuquerque II, 119 N.M. at 166, 889 P.2d at 201. "Where there is more than one sensible opinion, the decision of the [agency] will be upheld if it was achieved honestly with all pertinent authorization." Id. at 157, 889 P.2d at 192. For these reasons, Plaintiffs have not established a genuine issue of material fact as to whether Defendant Westinghouse acted "without lawful authority" with respect to radiological monitoring at the main exhaust shaft.

**Paragraph 39(g):** Plaintiffs' *Final Complaint* alleges that Defendant Westinghouse is "[k]nowingly relying on false or obviously inadequate Particle Studies that omitted data

for lightweight particles that could rise up the exhaust shaft at the WIPP site and contaminate the environment." Plaintiffs claim that such reliance is significant because "[t]his study was used to claim that particle emissions from the facility would not violate the Clean Air Act or the Atomic Energy Act." [Doc. No. 168, at ¶ 39(g).]

To support their allegation that the particle studies in question are "false or obviously inadequate," Plaintiffs point to concerns raised by the EEG. Such concerns, however, are not reflected in the record. Dr. Chaturvedi, who represented the EEG during the relevant time period, stated in his deposition testimony that he never "presented any concerns regarding the particle studies that were done to support the level of monitoring at the WIPP site." [Chaturvedi Dep. at 104.]

Plaintiffs also reiterate their contentions that the existing radiological monitoring regime at the WIPP site is not sufficient to detect low-level plutonium releases. The evidence cited by Plaintiffs in support of these contentions does not show that the particle studies are "false or obviously inadequate." At best, Plaintiffs' evidence only shows the presence of a dispute among experts in the scientific community. Under the standard of review set forth by the New Mexico Supreme Court in City of Albuquerque II, 119 N.M. at 157-158, 889 P.2d at 192-93, it is not this Court's role to substitute its judgment for that of the agencies charged with regulating the radiological monitoring at the WIPP facility or to decide which point of view on such highly technical issues is more sensible. Moreover, the existence of a technical dispute as to the particle studies at issue here does not necessarily

76

mean that Defendant Westinghouse has engaged in any violation of the law or that its actions are not "duly authorized." For these reasons, Plaintiffs have failed to carry their burden of presenting evidence which could support a reasonable inference that Defendant Westinghouse's activities with respect to particle studies or radiological monitoring are being conducted without lawful authority.

**Paragraphs 37, 38, 39, 47, 48, and 49:** I next examine whether the evidence cited in support of Plaintiffs' allegations, taken as a whole, may support a claim to enjoin Defendant Westinghouse's operation of WIPP as a public nuisance. In examining this broader question, the Court recognizes the rule that: "If the public works project is in existence and poses a present nuisance, due authorization is a qualified defense; courts may or may not decide that despite the defense the project is still a nuisance." City of Albuquerque II, 119 N.M. at 165, 889 P.2d at 200. Thus, even though the Court concludes that each of the specific activities of Defendant Westinghouse that are challenged in Plaintiffs' *Final Complaint* are "duly authorized," Plaintiffs still may defeat Defendant Westinghouse's motion for summary judgment by showing that WIPP presents an existing nuisance in fact for which this defense does not apply. In other words, even though the evidence presented by Plaintiffs does not establish a violation of law, this evidence may still be considered in determining whether WIPP presents an existing nuisance in fact.

To support the proposition that a public works project may present an existing nuisance in fact despite being duly authorized, the New Mexico Supreme Court cited two

cases from New Hampshire. See City of Albuquerque II, 119 N.M. at 166, 889 P.2d at 201 (citing Ferguson v. City of Keene, 279 A.2d 605, 608 (N.H. 1971), and Webb v. Town of Rye, 230 A.2d 223, 226-28 (1967)). One of the cited cases is not relevant here because it involved a claim for damages rather than injunctive relief. See Ferguson, 279 A.2d at 608.

The other New Hampshire case involved the operation of a town dump and refuse burner adjacent to a residential neighborhood. See Webb, 230 A.2d at 226-227. The refuse burner operated seven days per week, causing an unbearable degree of odor, smoke, and gases to be blown continuously toward the plaintiff's property and that of other neighboring residents approximately 650 feet away. The residents became nauseated and suffered from a lack of sleep as a result. Their properties required an unusual degree of repairs due to the oily film and ash produced by the burner. In addition, the town dump operated a diesel payloader all day long which created a noise problem early in the morning. The town also erected a heavy bright light by the refuse burner which reflected continuously into the plaintiff's residence. See id.

Despite this compelling evidence of an existing nuisance, the Supreme Court of New Hampshire declined to immediately enjoin the town from operating the refuse burner. Rather, the matter was remanded to the trial court to allow the town a reasonable opportunity to install pollution-control devices on the refuse burner and demonstrate their effectiveness in eliminating the nuisance. See id. at 228-29.

In this case, the Defendants already have installed and maintained such devices in

order to prevent the release of hazardous or radioactive waste into the environment, and they have demonstrated the effectiveness of such devices to the satisfaction of the NMED and the EPA. Plaintiffs have presented no evidence that WIPP has actually exposed members of the public to any measurable or significant quantity of hazardous or radioactive waste. They have presented no evidence of excessive noise, light, or odors emanating from the WIPP facility and affecting nearby residents. Rather, Plaintiffs rely on the mere possibility that such nuisances might result in the future as a result of inadequate waste characterization, malfunctioning radiation monitors, improperly designed equipment, or some unanticipated catastrophic event. While such possibilities must be taken into account and guarded against by the relevant agencies, they are not legally sufficient to sustain a claim that a duly authorized public works project presents an existing or inevitable nuisance in fact under New Mexico law. See City of Albuquerque II, 119 N.M. at 166, 889 P.2d at 201. For all of the above reasons, Defendant Westinghouse is entitled to summary judgment on Plaintiffs' public-nuisance claim.

### 4. Plaintiff's Claim Against Defendant CAST

Paragraphs 43 through 46 of Plaintiffs' *Final Complaint* contain allegations directed at Defendant CAST. With respect to some of these allegations, Plaintiffs have not come forward with any supporting evidence or argument in response to Defendant CAST's motion for summary judgment. For example, Plaintiffs' response brief points to no admissible evidence to support the allegation that "Defendant CAST has knowingly transported waste

with an unacceptable risk for the potential for methane gas fires." [Doc. No. 168, at ¶ 44.]
Because Plaintiffs bear the burden of proof with respect to each of these allegations, it
follows that Defendant CAST is entitled to summary judgment based on the lack of any
supporting evidence or argument in Plaintiffs' response. See Adler, 144 F.3d at 670-72;
Tran, 355 F.3d at 1266. The Court will not discuss these unsupported allegations in any
further detail in this *Memorandum Opinion and Order*. Instead the Court limits its analysis
to those issues on which Plaintiffs have submitted evidence and argument in response to
Defendant CAST's motions.

Plaintiffs cite the following evidence to support their claim that Defendant CAST's
activities present a public nuisance: (1) deposition testimony of Mr. Zappe and a related
press release regarding shipments of waste from Los Alamos National Laboratory that fell
below the transuranic threshold [Zappe Dep. at 88-89; Ex. 9 to Doc No. 279]; (2) deposition
testimony of an assistant general manager at WIPP, David Reber, recounting an incident in
which an unidentified odor was detected during the unloading of a TRUPACT container
inside WIPP's waste handling facility [Reber Dep. at 66-73]; (3) deposition testimony and
a written statement regarding an incident in which the driver of a truck bound for the WIPP
facility was given a verbal warning by a state trooper for exceeding the speed limit by four
miles per hour [Vettraino Dep. at 81-84, 89-91; Unmarked Ex. to Doc No. 274]; (4) three
affidavits by private individuals who claim to have observed one WIPP truck traveling in
excess of the posted speed limit on April 28, 1999 [Ex. 4, 5, 6 to Doc No. 274]; (5) police

reports regarding an incident in which a WIPP truck left an interstate highway in Wyoming, crossed the median, and came to rest in an adjacent field when its driver became ill and lost consciousness [Ex. 7 to Doc No. 274]; (6) deposition testimony regarding an incident in which an intoxicated driver collided with a truck destined for the WIPP facility [Hughes Dep. at 26-29]; (7) a document identifying the WIPP transportation routes in the State of New Mexico [Ex. 9 to Doc No. 274]; (8) survey results and deposition testimony of Defendant CAST's president, Richard Eshe, regarding emergency response issues [Eshe Dep. at 49-52; Doc No. 213]; and (9) a letter from the Secretary of the New Mexico Department of Public Safety summarizing the results of inspections of WIPP drivers, trucks, and cargo [Ex. 11 to Doc No. 274; Ex. to Doc No. 208.] The Court first examines these items individually and then turns to the broader question of whether the evidence of record as a whole may support a claim to enjoin Defendant CAST's activities because they present a public nuisance.

Mr. Zappe's deposition testimony and the related press release do not support a reasonable inference that Defendant CAST acted without lawful authority or caused a public nuisance. These documents only show that LANL (not CAST) mistakenly included waste that is *less* radioactive than transuranic waste in its shipments to WIPP. While this mistake may be viewed as an inefficient use of public resources (as suggested in the NMED's press release), Plaintiffs have not shown any increase in the danger to public health or the environment as a result of this problem. In any event, the press release indicates that the

81

NMED suspended further shipments from LANL until the problem is resolved. [Ex. 9 to Doc No. 279.] Mr. Zappe admits in his deposition testimony that he cannot speak to whether LANL's mistake constituted a violation of law "because that's an EPA determination." [Zappe Dep. at 89.] Plaintiffs have submitted no admissible evidence from the EPA on this issue.

Similarly, neither the survey results nor the deposition testimony of Mr. Eshe cited by Plaintiffs support a reasonable inference that Defendant CAST is acting without lawful authority or creating a public nuisance. This evidence raises questions about the level of preparedness of some of the state and local emergency response personnel who might be required to act in the event of an emergency involving one or more Defendant CAST's trucks; however, Plaintiffs have not shown that the existing level of preparedness constitutes a violation of law or that there have been any actual incidents in which harm to the public resulted from a lack of preparedness by emergency responders. Essentially, Plaintiffs argument regarding the alleged lack of preparedness of emergency responders asserts a theory of anticipatory nuisance based on what might happen in the future if there were an incident that emergency responders were not prepared to handle. Absent evidence of a violation of law, "due authorization" provides a complete defense to this theory. See City of Albuquerque II, 119 N.M. at 165-66, 889 P.2d at 200-01.

Plaintiffs' evidence regarding the unidentified odor in WIPP's waste handling facility also does not support a reasonable inference that Defendant CAST acted without lawful

authority or caused a public nuisance. The deposition testimony cited by Plaintiffs does not show that any hazardous or radioactive substance was released into an area occupied by members of the public or that anyone suffered a legally cognizable injury as a result of the incident in question. Rather, the deposition testimony indicates that the odor was contained in WIPP's waste handling building and the building was evacuated; then a couple of the evacuated employees were evaluated by a nurse, and an industrial hygienist was sent in to look for the presence of any hazardous materials or odors in the building. The nurse determined that the employees could go back to work as there were no health issues of concern. The industrial hygienist also did not detect anything of concern. [Reber Dep. at 69-73.] Plaintiffs have submitted no admissible evidence to contradict the deponent's recollection of the nurse's findings or those of the industrial hygienist, nor have Plaintiffs' provided any authority to support the proposition that this incident resulted in the violation of any law, regulation, or permit condition.

Similarly, the traffic accident in which a truck destined for WIPP was struck by another vehicle does not support a reasonable inference that Defendant CAST acted without lawful authority or created an existing nuisance. The deposition testimony cited by Plaintiffs indicates that the accident was caused by the driver of the other vehicle, who was intoxicated, and that the truck only "sustained a small amount of damage on the fender and on the tire." [Hughes Dep. at 26-29.] Plaintiffs have submitted no admissible evidence that any member of the public was exposed to a release of hazardous or radioactive waste as a

83

result of this accident. Rather, the deposition testimony cited by Plaintiffs indicates that the waste remained within the TRUPACT container in which it was shipped. Defendant CAST has submitted evidence that the containers used to transport waste to WIPP are certified by the Nuclear Regulatory Commission (NRC) [Ex. 3 to Doc. No. 215, Doc No. 216], and Plaintiffs have presented no evidence to the contrary in response to Defendant CAST's motions. While there may have been evidence of contamination leaking from a drum inside the container, the evidence also indicates that the container operated successfully by preventing the waste or any internal contamination from escaping into the environment when the accident occurred.

I next address the evidence that WIPP trucks have violated speed limits or other traffic regulations. Out of a total of 2017 shipments from March 19, 1999, to March 31, 2004, Plaintiffs have identified a total of two instances in which WIPP trucks were observed to be traveling in excess of the posted speed limit, and one instance in which a driver was cited for improper lane use as a result of a single-vehicle traffic accident in Wyoming. In addition, Plaintiffs have submitted a letter indicating that forty-two (42) shipments, or 5.87% of the total number inspected, may have violated the "North American Standard Inspection or Level VI Out-of-Service" criteria. [Ex. 11 to Doc No. 274.]

Although the evidence submitted by Plaintiffs is far from conclusive on this point, the Court assumes for purposes of analysis that the two instances of speeding, the one instance of improper lane use, and the forty-two shipments identified by Plaintiffs constitute

84

violations of law sufficient to defeat the "due authorization" defense in this narrow context. It does not necessarily follow from this assumption, however, that Defendant CAST has created a public nuisance.

In order to defeat Defendant CAST's motion for summary judgment, Plaintiffs must still come forward with evidence and authority to support every other essential element of their claim. They also must present evidence which could satisfy each of the requirements for granting the broad injunctive relief that they request.

I note that the laws setting speed limits and restrictions on lane use are laws of general applicability that apply to all vehicles traveling on the State's highways. In order to warrant injunctive relief under New Mexico law, however, Plaintiffs must show that their complaints against Defendant CAST amount to more than those that "'could be made against any business'" which operates a fleet of vehicles. Phillips, 38 N.M. at 366, 33 P.2d at 913 (quoting Penn. Co. v. Sun Co., 138 A. 909, 910 (1927)). To enjoin Defendant CAST's trucks as public nuisances merely because, like all other vehicles, they are generally susceptible to speeding, improper lane use, and traffic accidents "'would greatly widen the heretofore existing scope of equity jurisdiction, and greatly hamper necessary business through groundless fears.'" Phillips, 38 N.M. at 367, 33 P.2d at 913 (quoting Penn. Co., 138 A. at 910). Rather than relying on such generalized apprehensions about the possibility of traffic violations or accidents, Plaintiffs must show that theirs is an "extreme case[] of pressing necessity . . . where there is . . . irreparable injury for which there is no adequate and

complete remedy at law." Scott, 99 N.M. at 572, 661 P.2d at 64; accord Padilla, 101 N.M.
at 562, 685 P.2d at 970.

The State of New Mexico already provides a remedy at law for traffic violations, and
the New Mexico Supreme Court has stated that "more than a mere violation of the criminal
statute must be shown before a court would be justified in enjoining a defendant's conduct
as a public nuisance." Davis, 65 N.M. at 132, 333 P.2d at 616; see also Egolf, 107 N.M. at
318, 757 P.2d at 374 ("We conclude that, even if there had been a violation of the zoning
ordinance, there was substantial evidence for a finding of no nuisance."). In order to warrant
injunctive relief under a nuisance theory in this context, Plaintiffs must show that "the
activity complained of is continuous in nature and its frequency or constant reoccurrence
renders a remedy at law inadequate except by means of a multiplicity of suits." Scott, 99
N.M. at 572, 661 P.2d at 64.

Even when viewed in the light most favorable to Plaintiffs, the evidence of record
does not satisfy this requirement. In particular, it is not reasonable to infer from the two
reported instances of speeding and the one reported improper lane use that CAST's trucks
are violating traffic rules on New Mexico's highways on a continual or frequent basis.
According to the deposition testimony of Sam Vettraino submitted by Plaintiffs, the trucks'
engines are outfitted with governors which generally prevent them from exceeding 65 miles
per hour. Access to a password is needed to change the settings on the governors, and such
access is restricted so as to prevent tampering. Thus, Defendant CAST's trucks generally

are incapable of exceeding sixty-five miles per hour except when the force of inertia carries them faster going downhill, as in the reported incident in which a CAST truck traveled at 69 miles per hour down a hill. That incident was detected by the State Police, and the driver involved in that speeding incident was no longer believed to be working for CAST at the time of Mr. Vettraino's deposition. [Vettraino Dep. at 81-84, 89.] The incident involving improper lane use occurred in Wyoming and involved unintentional conduct by a driver with an impacted bowel. [Ex. 7 to Doc No. 274.] It is not reasonable to infer from this evidence that such incidents are likely to recur on a continual basis or at such a high frequency as to render "a remedy at law inadequate except by means of a multiplicity of suits." Scott, 99 N.M. at 572, 661 P.2d at 64.

Similarly, the letter from the Secretary of the New Mexico Department of Public Safety does not support a reasonable inference that CAST's trucks are continually or frequently allowed to travel on New Mexico's highways while in violation of "any North American Standard Inspection or Level VI Out-of-Service Criteria." Rather, the letter states that "all shipments are inspected before being allowed to travel on New Mexico highways, thereby giving confidence to New Mexico citizens and visitors alike that the shipments are safe enough to travel and share the roadway with all concerned." When vehicles are found to be in violation of the above criteria, "the vehicle is placed Out-of-Service and repair or replacement must be undertaken before the vehicle is allowed to proceed upon New Mexico roadways." Thus, even with respect to the 5.87% of shipments where violations of these

87

criteria allegedly were detected, Plaintiffs have not shown that Defendant CAST's trucks are allowed to remain in service and continue traveling on New Mexico's highways. [Ex. 2 to Doc No. 208 (missing page 2); Ex. 11 to Doc No. 274.] The evidence of record indicates that the New Mexico Department of Public Safety's inspection and enforcement regime provides an adequate remedy at law for this situation.

Viewing the evidence pertaining to Defendant CAST as a whole and in the light most favorable to Plaintiffs, the Court still concludes that Defendant CAST is entitled to summary judgment. The relatively small number of traffic violations shown here is not legally sufficient to support a claim to enjoin all of Defendant CAST's operations relating to WIPP as an existing nuisance in fact. See Davis, 65 N.M. at 132, 333 P.2d at 616. To be sure, these violations take on greater significance in light of the hazardous or radioactive cargo that the trucks are carrying; however, Plaintiffs have not shown "an adverse effect on the general public due to the particular time, place, or circumstances involved." Id. at 132, 333 P.2d at 616. In particular, they have presented no admissible evidence that Defendant CAST has caused personal injury to any member of the public or caused the release of any significant quantity of radioactive or hazardous waste into the environment as a result of the traffic violations or other incidents mentioned above.

To the extent that Plaintiffs assert a claim of anticipatory nuisance, rather than an existing nuisance, with regard to the traffic violations noted above, Defendant CAST is entitled to summary judgment because an injunction will not issue where "the apprehended

dangers relied upon to constitute a nuisance were doubtful, eventual or contingent, rather than a necessary result or highly probable." Gonzalez, 97 N.M. at 714, 643 P.2d at 278 (citing Phillips, 38 N.M. at 366, 33 P.2d at 913); see Restatement, supra, § 933, cmt. b (noting that the threat must be "of sufficient seriousness and imminence to justify coercive relief"). The relatively small number of traffic violations identified by Plaintiffs do not support a reasonable inference that Defendant CAST's use of the State's highways is so reckless or lawless as to make it highly probable that an accident involving the release of hazardous or radioactive waste, or other serious threats to public health or safety, will result. For all of the above reasons, Defendant CAST is entitled to summary judgment on Plaintiffs' public-nuisance claim.

## III.  **CONCLUSION**

For the foregoing reasons, Defendants Westinghouse and CAST are entitled to summary judgment on Plaintiffs' public-nuisance claim. The Private Defendants' motion to dismiss or, alternatively, for a ruling on Plaintiffs' Rule 60(b) motion is denied as moot in light of the Court's ruling on the summary-judgment motions. Plaintiffs' objections to the Magistrate Judge's discovery order, as well as their motion for joinder of Tri-State, are denied. The Private Defendants' motion to strike Plaintiffs' jury demand is granted, and the *Order to Show Cause* is quashed.

**IT IS THEREFORE ORDERED** that the *Order to Show Cause* [Doc. No. 296] filed on July 1, 2004, is **QUASHED.**

89

**IT IS FURTHER ORDERED** that Defendant Westinghouse Electric Company's *Motion for a Ruling on Plaintiff's Motion to Alter the Court's Prior Judgment Dismissing Westinghouse or in the Alternative for an Order Dismissing All Claims Against Westinghouse and CAST* [Doc. No. 194] filed on June 2, 2003, is **DENIED**.

**IT IS FURTHER ORDERED** that *Plaintiffs' Objections to Magistrate's Order of August 20, 2003 Adopting Provisional Discovery Plan* [Doc. No. 223] filed on September 4, 2003, are **DENIED** and the Magistrate Judge's *Order* [Doc. No. 221] is **AFFIRMED**.

**IT IS FURTHER ORDERED** that Plaintiffs' *Motion for Joinder of Tri-State Motor Transit Company, Party Needed for Just Adjudication Pursuant to Rule 19, and Motion for Issuance of Summons* [Doc. No. 228] filed on October 22, 2003, is **DENIED**.

**IT IS FURTHER ORDERED** that *Defendant CAST Transportation, Inc.'s Motion for Summary Judgment* [Doc. No. 262] filed on April 5, 2004, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants Westinghouse and CAST Transportation's *Motion to Strike Jury Demand* [Doc. No. 265] filed on April 5, 2004, is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Westinghouse's *Motion for Summary Judgment* [Doc. No. 267] filed on April 5, 2004, is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE**
as to all parties and all claims.

**SO ORDERED** this 30th day of September, 2004, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**

91